525 F.2d 532
 Mary FLETCHER, on behalf of herself and all other persons
similarly situated, Plaintiffs-Appellants,
v.
The HOUSING AUTHORITY OF LOUISVILLE, Individually and on
behalf of all other public housing authorities, et
al., Defendants-Appellees.
 No. 73--1466.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 21, 1975.
Decided Oct. 24, 1975.
 
 Kurt Berggren, Legal Aid Society of Louisville, Louisville, Ky., David M. Kirstein, Boston College Law School, Brighton, Mass., Howard E. Cohen, Massachusetts Law Reform Institute, Boston, Mass., for plaintiffs-appellants.
 George J. Long, U.S. Atty., Louisville, Ky., William E. Grossman, Neal Knox, Dept. of HUD, Atlanta, Ga., J. D. Raine, Zirkle, Raine, Francis & Highfield, Louisville, Ky., William Kanter, Barbara L. Herwig, Appellate Section, Dept. of Justice, Washington, D.C., for defendants-appellees.
 Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 This appeal is before us for the second time. On October 15, 1974, the Supreme Court vacated our decision of January 25, 1974, and remanded 'for further consideration in light of Pub.L. No. 93--383 (August 22, 1974).'
 
 
 2
 In our prior Opinion,[1] we held that a rent-range formula enacted by the Housing Authority of Louisville (HAL) and prompted by a circular of the Federal Department of Housing and Urban Development (HUD) violated the National Housing Act of 1937. The vice of the admissions formula was that it discriminated against the poorest applicants for public housing. It 'impose(d) a significant penalty on the group of eligible applicants who have been on the waiting list for public housing since August 22, 1972' and did so on a basis that was 'beyond a local public housing agency's discretion to enact and beyond HUD's proper discretion to require or enforce.' Fletcher v. Housing Authority of Louisville, 491 F.2d 793, 798, 807 (6th Cir. 1974). We recognized HAL's and HUD's concern that public housing be fiscally solvent, but refused to uphold a means of generating revenue that violated the National Housing Act of 1937. As we stated.
 
 
 3
 HUD will have to win Congressional approval before it may again try to implement such a preference for more affluent applicants. 491 F.2d at 807.
 
 
 4
 HUD and HAL argue on remand that the Housing and Community Development Act of 1974[2] gives them the authority that in our view they lacked under prior law. HUD and HAL point to a specific section of that Act as authorizing an admissions policy aimed at achieving a tenant population of mixed incomes:
 
 
 5
 Every contract for annual contributions (to local housing authorities) shall provide that--
 
 
 6
 (4) the public housing agency shall comply with such procedures and requirements as the Secretary (of HUD) may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to--
 
 
 7
 (A) the establishment of tenant selection criteria designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes and will avoid concentrations of low-income and deprived families with serious social problems, but this shall not permit maintenance of vacancies to await higher income tenants where lower income tenants are available.[3]
 
 
 8
 As counsel for HAL, HUD, and Appellants agreed at oral argument, the 1974 Act is not retroactive. Indeed, the above-quoted section is not yet the law of the United States. As section 201(b) of the 1974 Act states.
 
 
 9
 The provisions of subsection (a) of (Section 201) shall be effective on such date or dates as the Secretary of Housing and Urban Development shall prescribe, but not later than eighteen months after the date of the enactment of this act . . ..
 
 
 10
 Although counsel for HUD provided this Court with a copy of a Notice to Local Housing Authorities containing a proposed regulation to implement the Act in regard to income-related tenant selection criteria, the 1974 Act is not yet effective in this regard. Indeed, as the regulation has been proposed for comment, it would be improper for us to assume that the proposal will emerge unchanged from a process intended to improve and refine it.
 
 
 11
 Because the provisions of the 1974 Act are not before us, we will not render an advisory opinion on how it may affect our Judgment at some future time.
 
 
 12
 HUD advanced the argument in its Brief that the New Act and its legislative history 'sheds light' on the old Act and should require a reversal of our earlier Judgment. Legislative action cannot, however, change ex post facto what was the intent of prior legislation. Judicial review of the statutory authority of administrative action would be meaningless if we were to allow a losing party to secure statements from a legislature that the courts had misinterpreted the intent of a prior legislature and then to force a reversal of the judicial result based on such an ex post facto basis. We remain convinced that our prior holding was based on a correct interpretation of the National Housing Act of 1937. Until the 1974 amendments take effect, we have no cause to modify that view.
 
 
 13
 Finally, counsel for HUD suggested at oral argument that the controversy might at this stage be moot, since in counsel's estimation the named plaintiff has probably been admitted to public housing.
 
 
 14
 Counsel's guess is not an assurance on which we may act. We do not know, and nothing has been presented to us that demonstrates, that the named plaintiff has been admitted to public housing. Furthermore, even if the named plaintiff is now a public housing tenant, our Judgment extended benefits to a broader and properly certified class of plaintiffs.
 
 
 15
 The case on which HUD relies to require a mootness determination indicates that 'dismissal is required . . . when the claims of all the named plaintiffs become moot before certification of the class under Fed.R.Civ.P. 23(c)(1).' Bradley v. Housing Authority of Kansas City, 512 F.2d 626, 628 (8th Cir., 1975). See Board of School Comm'rs v. Jacobs, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). Here a class was certified by the District Court's Order of November 27, 1972, which is well before the named plaintiff's claim could possibly have become moot. That class includes all persons 'similarly situated' as the named plaintiff, i.e., all who have been and remain adversely affected by the rentrange formula adopted by HAL on August 22, 1972. Accordingly, a live controversy remains between HAL and numerous persons, and the nature of that controversy will not change at least until the 1974 Act goes into effect.
 
 
 16
 The Judgment of this Court will be reinstated.
 
 
 17
 EDWARDS, Circuit Judge (dissenting).
 
 
 18
 This is the second time this appeal has been before this court. On the first presentation the majority opinion held that the 'rent range formula' adopted by the Housing Authority of Louisville and approved as both legal and constitutional by the District Judge was contrary to the federal housing statutes constituting the United States Housing Act of 1937, as amended, 42 U.S.C. § 1401 et seq. (1970). My dissent held that while the rent range formula attacked was dubious social policy, it was nonetheless within the broad powers given the agency by Congress and was not a violation of the United States Constitution.
 
 
 19
 The Supreme Court granted certiorari and then vacated the judgment and remanded 'for further consideration in light of Public Law No. 93--383, August 22, 1974, 43 U.S.L.W. 3206 (U.S. Oct. 15, 1974).'
 
 
 20
 The applicable portion of Public Law No. 93--383 is as follows:
 
 
 21
 (4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to--
 
 
 22
 (A) the establishment of tenant selection criteria designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes and will avoid concentrations of low-income and deprived families with serious social problems, but this shall not permit maintenance of vacancies to await higher income tenants where lower income tenants are available; Title II, Sec. 201(a), § 6(c)(4)(A), 88 Stat. 660 (1974).
 
 
 23
 Additionally, Section 3(1) of Title II § 201(a) requires that 'at least 20 per centum of the dwelling units . . . shall be occupied by very low-income families,' defined as families whose incomes do not exceed 50% of the median income for the area concerned.
 
 
 24
 The only relevant legislative history pertaining to those provisions is found in the Senate Report on No. 93--693, U.S. Code Cong. & Admin.News 1974, p. 4273:
 
 
 25
 Occupancy would be limited to families who at time of entry are low-income families, and at least 20% of all new housing developed would be occupied by very low-income families. Very low-income families are defined as families whose income does not exceed 50% of the median income for the area. While it is expected that the public housing agencies will continue to give particular attention and priority to very low income families, the Committee expects that in the long run we would have more housing developments which are not occupied solely by the very poor, but by a cross section of lower income households, representing a variety of household types. Experience has demonstrated that a cross-section of occupancy is an essential ingredient in creating economically viable housing as well as a healthy social environment. It is recognized by the Committee that existing public housing in many of our largest cities has become a concentration of very poor families and often predominately of families receiving public assistance. The provisions of this Act make it possible to develop new public housing with a cross section of low income families. At the same time, it is clear that steps must also be taken to alter the occupancy in existing public housing to achieve a similar cross-section of occupancy. It is the intent of the Committee that the Secretary of HUD take appropriate steps to assist public housing agencies to achieve this cross section of occupancy requirements which have the effect of denying admission to any family on the basis that its income is too low. P.L. No. 93--693 at 3817, U.S. Code Cong. & Admin.News 1974, at p. 4311.
 
 
 26
 Thus the statutory enactment which the United States Supreme Court instructed this court to consider upon remand of this case now requires as to future tenant selection criteria that they be designed so as to 1) assure projects which will 'include families with a broad range of income'; 2) 'avoid concentrations of low-income and deprived families with serious social problems'; and 3) guarantee that 'at least 20% of the dwelling units (will) be occupied by very low income families.'
 
 
 27
 Title II, of course, deals only with providing publicly assisted housing for low income families, as defined in the Act (Title II, Sec. 201(a), §§ 2, 3)--namely, those families whose income is so low as to prevent their securing 'decent, safe and sanitary housing' in the private housing market.
 
 
 28
 Congress could, of course, have provided such housing exclusively to the very lowest income families in the total low income family category described above. Clearly, however, Congress never intended to do so. In the debate preceding the adoption of the 1949 Amendments to the United States Housing Act of 1937, Senator Sparkman offered this explanation of the Congressional purpose:
 
 
 29
 The primary purpose of public housing is to provide decent housing for families living in the slums. Families having the worst housing should get preference. This does not, however, means (sic) that public housing should be used as a program of monetary relief for families who have no income or incomes that are far below the level of bare subsistence. It is the function of welfare and relief agencies to provide such families with the bare minimum of subsistence. The Federal Government should not provide funds to get rents so low that families with little or no income can be accommodated. To do so is really to put local relief assistance in those communities which do not provide reasonable welfare assistance. Welfare agencies must provide these families with a minimum subsistence income, and public housing can and will then accommodate them under the bill at rents in proper relation to their actual income--regardless of its source. They can and will do this under the present provisions of the bill.
 
 
 30
 The same is true in relation to the preference for units at a specified rent. This limitation is necessary in order to assure that the families with the very lowest incomes get a fair chance at the dwellings in a public housing project when it is first tenanted. Experience has shown that as among the families in the low-income group who are in urgent need of housing, the families with the higher rather than the lower incomes tend to apply first. These families are more active and are better informed, while the families of lowest income often do not as quickly appreciate that public housing is actually being made available to them. Time after time, housing authorities have been told by the most under-privileged families that they had not applied earlier because they could not believe 'this project was really being built for the likes of us.' Local authorities have many times had to enlist the help of welfare agencies and religious organizations in making clear to the families whose housing need is most urgent and whose incomes are lowest, that these projects are actually for them. It is therefore clear that the requirement of S. 1070 that the preference in respect to housing need should be at specified rents is a necessary and proper one in order to make sure that a fair proportion of lowest-income families are properly served. 95 Cong.Rec. 4808--09.
 
 
 31
 The recent enactment of P.L. No. 93--383 is consistent with the purposes described above.
 
 
 32
 The United States Housing Act of 1937 has been repeatedly upheld as to constitutionality. See City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945). We have no doubt that the following three purposes of P.L. No. 93--383, Title II, are constitutional likewise. Congress has a right to provide 'a broad range of income' within the general low income family category in order to prevent default on repayment of local authority bonds guaranteed by the United States. The prevention of absolute concentration of lowest income families with serious social problems is likewise a reasonable congressional purpose. Finally, Congress has provided a specific mandate for 'at least 20%' of the housing units to be occupied by 'the lowest-income families.'
 
 
 33
 I note that Congress did not repeal any prior statutory language conveying broad authority to HUD and the local housing authorities to fix income admission criteria and rents. See United States Housing Act of 1937, as amended, 42 U.S.C. § 1401 (1970). Compare 42 U.S.C. § 1410(b) and (g) with § 5(b) and § 6(c) of the 1974 Amendments.
 
 
 34
 Thus far in the history of housing litigation and legislation no case law or statute has declared any legal right to shelter at public expense. The national effort to alleviate the housing shortage for low income families has never been financed at a level which contemplated meeting the total need. Nor has the housing subsidy provided by Congress ever been sufficient to pay the total cost of the housing which was built. Rental payments from the tenants of publicly assisted housing have always been required to meet the costs of construction, operation and maintenance--offset only by the yearly subsidy. When inflation increases operating costs or the subsidy payments provided are inadequate, HUD and the local housing authorities have no recourse except to increase both rent and income admission criteria.
 
 
 35
 As I read P.L. No. 93--383, it was designed explicitly to command the tenant selection criteria in which HUD and the Louisville Housing Authority had previously joined in promulgating in HUD circular HM 7465.12 and HAL's Rent Range formula Resolution No. 51--72. Since this formula was within agency discretion prior to the 1974 Amendments, I would affirm the original judgment of the District Court.
 
 
 
 [1]
 Judge Edwards dissenting
 
 
 [2]
 Act of August 22, 1974, Pub.L. No. 93-383, Title II, 20(a) et seq., 88 Stat. 653
 
 
 [3]
 Title II, § 201(a)(6)(c)(4)(A)