Josefina GONZALEZ, Chuen Chu Wong, Mo Long Wong, Oscar Weiss, Jose Torres, Poa Kong Chong, Edna Singleton, Crispula Zaragoza, Randall Smith, Frances Friedkiss, Manuela Concepcion, Rita Mena, Nora Robertson, Josephine Lisi, Gim Oy Lee, Leon Lee, Roselyn Lee, Su-Uo Chen Yeh, Guey Check Chung, Charlotte Ehrlich, Harry N. Beckerman, Ann Piaggessi, and Katherine Caracciola,

v.

ST. MARGARET'S HOUSE HOUSING DEVELOPMENT FUND CORPORATION, a New York Corporation, The United States Department of Housing and Urban Development, and Samuel R. Pierce, Jr., as Secretary of the U.S. Department of Housing and Urban Development, Defendants.

No. 84 Civ. 1697 (PNL).

United States District Court, S.D. New York.

Aug. 7, 1987.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Elaine H. Mandelbaum, David G. Bookbinder, of counsel, and The Legal Aid Society, Civil Appeals and Law Reform Unit, New York City, Scott Rosenberg, of counsel, for plaintiffs.

Cadwalader, Wickersham & Taft, New York City, Peter G. Bergmann, Joseph Polizzotto, Paul G. Thomas, of counsel, for defendant St. Margaret's House Housing Development Fund Corp.

Rudolph W. Giuliani, U.S. Atty. for S.D. of N.Y., New York City, Richard W. Mark, Asst. U.S. Atty., John W. Herold, Asst. Gen. Counsel for Litigation, Joseph W. Lobue, Trial Atty., U.S. Dept. of Housing & Urban Development, of counsel, for Federal defendants.

## OPINION AND ORDER

LEVAL, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs are tenants of St. Margaret's House, a low-income congregate care housing facility in lower Manhattan operated by St. Margaret's House Housing Development Fund Corporation. The defendants are St. Margaret's, the United States Department of Housing and Urban Development ("HUD") and HUD Secretary Samuel R. Pierce, Jr. Plaintiffs challenge the lawfulness of the imposition by St. Margaret's House (with approval by HUD) of a mandatory meal charge as a condition of occupancy. St. Margaret's counterclaims under its rental agreements with the plaintiffs for unpaid meal charges to which plaintiffs agreed, but which several plaintiffs have withheld during the course of this action. In defense against the counterclaim, plaintiffs rely on the alleged unlawfulness of the charge and also on the contention that a HUD policy approving the charge was adopted in violation of the Administrative Procedure Act.

Plaintiffs' first and second claims allege that imposing the meal charge as a condition of occupancy violates the "Brooke

Amendment" to the Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), which caps each eligible tenant's "rent" at 30% of the tenant's adjusted gross income.[1] They argue first that the mandatory meal charge constitutes additional rent in excess of the 30% limitation. In addition, they argue that even if the charge is not rent, it violates the purpose of the Brooke Amendment to provide affordable housing to low-income elderly or handicapped persons. The third claim alleges that the meal plan violates the tenants' rights as third party beneficiaries of a Regulatory Agreement made between St. Margaret's and HUD, which plaintiffs interpret as barring all supplemental charges for services unless requested by individual tenants.

The fourth claim, directed only against the federal defendants, alleges that HUD's original policy authorizing such mandatory meal plans violated the rulemaking provisions of the APA, and was arbitrary and capricious in failing to require exemptions for medical and other reasons. This claim has been mooted as to future application by HUD's recent promulgation, observing all procedural requirements, of a rule requiring several exemptions in mandatory meal programs.

After a bench trial, I find that the mandatory meal charge does not constitute rent within the meaning of the Brooke Amendment and that St. Margaret's program does not contravene that law as reasonably interpreted by HUD. I also find that the Regulatory Agreement gives plaintiffs no right to be exempted from the meal charge. Finally, I conclude that St. Margaret's is entitled to judgment on its counterclaim, regardless whether HUD violated the APA in the original adoption of its policy.

## FINDINGS OF FACT

### Background

The construction of St. Margaret's House was financed by a direct loan from HUD pursuant to Section 202 of the Housing Act of 1959. 12 U.S.C. § 1701q. It opened in 1981 and currently houses 290 residents in 249 units (not including staff). Under the Section 8 Housing Assistance Program, HUD also supplies an operating subsidy of the difference between the authorized rent for the apartments and the maximum rent chargeable to the tenants under the 30% rent cap. *See* 42 U.S.C. §§ 1437a(a), 1437f(c)(3).

In its November 16, 1977 application for a Section 202 loan and Section 8 subsidies, St. Margaret's identified a mandatory meal plan as part of its proposed "core service program." Other core services included an optional housekeeping program, a health maintenance program, and a recreation and creative activity program. The specified purposes of the meal plan were to ensure proper nutrition, encourage social interaction and a sense of community, and allow management to identify residents' health problems as they arise.

The HUD Region II Director approved the mandatory meal plan by letter of June 1, 1981. Each tenant could be charged $110 per month for a daily meal. HUD required, however, that the charge be reduced as necessary in order to leave each resident at least $120 in residual income after paying rent and the meal charge. The other proposed "core services" at St. Margaret's House were to be financed out of the rent payments and subsidies, with no supplemental charge to residents.

HUD and St. Margaret's executed a Housing Assistance Payment ("HAP") con-

---

1. In Count 1, plaintiffs sue directly under the Brooke Amendment. I ruled earlier that there is an implied right of action to redress violations of the 30% income limitation. 620 F.Supp. 806, 809. The Supreme Court recently confirmed that tenants may sue in federal court to enforce this provision, although the cause of action was supplied by 42 U.S.C. § 1983. *See Wright v. Roanoke Redevelopment and Housing Authority*, — U.S. —, 107 S.Ct. 766, 93 L.Ed.2d 281 (1987).

In Count 2, plaintiffs make parallel claims as alleged third-party beneficiaries of agreements between HUD and St. Margaret's which incorporate the terms of the Brooke Amendment. I earlier ruled that the claim could withstand a motion to dismiss, particularly since its substantive merits would be reached anyway under Count 1. 620 F.Supp. at 811.

tract which incorporates the terms of the Brooke Amendment. They also entered into a Regulatory Agreement, which provides in paragraph 12(c):

Upon prior written approval by the Secretary, Mortgagor may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Mortgagor for any facilities and/or services which may be furnished by the Mortgagor or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule.[2]

The plaintiffs were informed before they signed their leases that participation in the meal plan was a condition of occupancy at St. Margaret's House. Each lease specifies that the resident is required to pay $110 per month in return for 30 meals. Each plaintiff signed a lease undertaking the obligation to pay the monthly meal charge before moving into St. Margaret's House.[3] All initially paid the meal charge and all but one at first ate the food. For several years, however, most of the plaintiffs have refused to pay the meal charge and none has taken the daily meal in the St. Margaret's dining room.

*Operation of the Meal Plan*

Meals at St. Margaret's House are provided by Nutrition Management Services Company ("NMS") under its contract dated January 1, 1984 with St. Margaret's. Residents receive 30 meal tickets a month. The resident may use the ticket at lunch or dinner at her option. The meal ticket entitles the resident to soup or juice, an entree, two vegetables, salad, bread and butter, dessert, milk or punch or soda, and coffee or tea. Foods appropriate for residents on low-salt, low-fat, and diabetic diets are available. Postings and dietary assistance are available to direct residents to such foods. In addition, the kitchen will attempt to accommodate special advance orders.

During the trial, together with counsel, I made an unannounced visit to St. Margaret's House for lunch. I found the meal to be ample, tasty and nutritious and the dining facility clean and pleasant.

Before the commencement of this action, St. Margaret's granted no exemptions from the meal plan. Since May 1985, however, St. Margaret's has permitted credit for missed meals and exemptions for employment, vacations, hospitalization, and medical reasons.

In order to receive a medical exemption from the meal program, a resident must provide St. Margaret's with a doctor's letter explaining the individual's special dietary needs. The individual is then asked to make an appointment with an NMS dietician. If St. Margaret's House, in consultation with the dietician, decides that NMS cannot meet the individual's dietary needs, she is exempted from the program. Five residents are currently exempted from the program pursuant to this policy, and another is partially exempted.

No plaintiff has been given a medical exemption. Plaintiffs contend the exemption procedure is not fairly administered. They argue that St. Margaret's and NMS have a financial interest in denying exemptions. They presented no evidence, however, that the exemption policy is administered unfairly. Indeed, although certain plaintiffs testified that they require a spe-

---

**2.** Paragraph 7(f) of the Regulatory Agreement provides:

Mortgagor shall not without the written approval of the Secretary ... [r]equire, as a condition of occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent (the gross family contribution in Section 8 units) plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease....

In addition, paragraph 11(j) provides:

The Mortgagor shall not collect from tenants or occupants or prospective tenants of occupants of the project any admission fee, founder's fee, life-care fee, or similar payment pursuant to any agreement, oral or written, whereby the Mortgagor agrees to furnish accommodations or services in the project to persons making such payments.

**3.** Many of the plaintiffs testified that they did not like the plan but agreed to it because they wanted to be admitted to St. Margaret's House.

cial diet for medical reasons, none has followed the reasonable procedure specified by St. Margaret's for a medical diet exemption. Although several plaintiffs testified they could not eat the meals for medical reasons and some wrote to request exemptions, none presented a doctor's prescription to St. Margaret's.[4]

Several residents asserted that they eat better and more cheaply preparing all their own meals than they would if they participated in the meal plan. Some further assert that they could not afford to remain at St. Margaret's House if they had to pay the meal charge. The plaintiffs did not, however, submit any budgets or analyses showing how they currently spend their money,[5] or how their budgets would be affected if they were required to pay for the mandatory daily meal.[6]

*HUD's Policy*

Since 1959, HUD and its predecessor, the Housing and Home Finance Agency, have permitted owners of federally-assisted projects for the elderly or handicapped to require their tenants to purchase meals in the project dining facilities. *See* 52 Fed. Reg. 6,300, 6,300 (Mar. 2, 1987). HUD maintained this position after the enactment of the Brooke Amendment and its application to Section 8/Section 202 Housing projects in the 1970s. As of 1981, HUD's policy was set forth in its Processing Handbook for Section 202 projects as follows:

> *Congregate Housing.* Congregate living facilities may be considered by an eligible Borrower. It may propose to supply tenants with food, maid service, or other personal services. However, in determining approvable Contract Rents under Section 8, staffing and other operating costs of such services may not be recognized. Agreement to purchase personal services or food in excess of one meal per day shall not be required as a condition of occupancy. It may be necessary for some services to be covered by tenants outside Section 8 rents or from funds provided by the Borrower from other sources. Where a Borrower proposes to furnish food or other services, the Borrower shall clearly separate such charges from the total charges for shelter and project-supplied utilities which are entered on Form FHA–2013.

*Section 202 Direct Loan Program for Housing for the Elderly or Handicapped, Processing Handbook,* 4571.1 Rev, § 5–32(c) (March, 1978).

In *Birkland v. Rotary Plaza, Inc.,* 643 F.Supp. 223 (N.D.Cal.1986), Judge Spencer Williams found that HUD had adopted this policy in violation of the publication requirement of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and in violation of the notice and comment procedures mandated by the APA. *Id.* § 553. On January 10, 1986, he ordered that HUD undertake notice and comment procedures to promulgate a mandatory meal policy as a final rule. In the interim, HUD was to publish the policy set forth in the Processing Handbook, modified by the requirement that medical and employment exemptions be provided to project residents. At 225–26.

HUD proceeded to publish the specified interim policy and notice of its proposed final rule. *See* 51 Fed.Reg. 4997 (Feb. 10, 1986); 51 Fed.Reg. 11,483 (Apr. 3, 1986);

---

**4.** Plaintiffs introduced a doctor's note dated September 11, 1986 stating that the plaintiff Gonzalez "must have her food made in a blender because of the diet she uses." Pltfs' ex. 4. Ms. Gonzalez testified at trial that she showed this note to Nancy Serpico, an administrator of St. Margaret's House. At her November 1986 deposition, however, Ms. Gonzalez testified that she never presented anyone at St. Margaret's House with a doctor's note. (Tr. 78–79.) Ms. Serpico did write to Ms. Gonzalez in response to a letter dated February 3, 1986, setting forth the procedure for obtaining a medical exemption. Tr. 357–58; Defts' ex. AA. Plaintiffs do not contend that Ms. Gonzalez subsequently followed this procedure.

**5.** One plaintiff did testify that she contributes $25 each month to her church. (Tr. 99.)

**6.** The residents apparently presumed that they could not or would not eat the meals and therefore would continue to purchase all their own food. However, plaintiffs failed to prove either that they are medically unable to eat in the dining hall or that St. Margaret's would refuse them exemptions if they demonstrate medical inability.

51 Fed.Reg. 32,764 (Sept. 1, 1986). After considering public comments and a March 1985 General Accounting Office report,[7] HUD issued its final rule on March 2, 1987. *Mandatory Meals Program in Multifamily Rental or Cooperative Projects for the Elderly or Handicapped,* 52 Fed.Reg. 6,300, 24 C.F.R. Part 278. The rule became effective on April 1, 1987.

The final rule adopts HUD's interpretation that the term "rent" as used in Section 8 does not include mandatory meal charges. 52 Fed.Reg. at 6,301, 24 C.F.R. §§ 278.1(c), 278.20(c). The rule authorizes the continuation of current HUD-approved programs, but bars adoption in the future of additional mandatory meal programs. 52 Fed.Reg. at 6,301. The rule also requires that projects provide exemptions from participation for medical and other reasons. 24 C.F.R. § 278.12.

HUD concluded that it should authorize the continuation of existing mandatory meal programs

> because ... [the programs] provide nutrition and socialization benefits and because if such programs were required to convert to voluntary participation, project sponsors may not be able to obtain necessary sources of subsidies to fund their programs, and thus might terminate them as financially infeasible. This result would frustrate the reasonable expectations of:
>
> (1) Sponsors who relied on HUD's mandatory meals policy in proposing projects that offered a mandatory meals program, included a central dining facility in their projects' design with specific HUD approval, and established a mandatory program because they had determined that without the mandatory nature of the meals program, attendance would be too unpredictable to ensure a sufficiently steady stream of income to continue the program on a financially sound basis—resulting in the possible economic necessity of terminating the meals programs in that project;

> (2) HUD, which approved and funded the inclusion of a central dining facility in the projects' construction, with the expectation that the project and its facilities would be used as the sponsor had intended; and
>
> (3) Tenants who accepted units in a HUD assisted project with a mandatory program because of the availability of a meals service at that project.

52 Fed.Reg. at 6,301.

St. Margaret's House has administered its mandatory meal program in accordance with its stated purposes and HUD's policy. At the time of trial, it was in the process of conforming its program to the final HUD rule. (Tr. 349.)

## DISCUSSION

### *The Brooke Amendment Claims*

At the start of this litigation, I denied defendants' motion to dismiss. I observed at the time that "any charge required as a condition of occupancy can be seen as rent, particularly if the charge is attributed to a service that the tenant does not desire and does not use." 620 F.Supp. 806, 808 (1985). I also noted that such a charge might violate the "purpose of the Brooke Amendment to provide publicly assisted housing for persons of very low income by assuring that the rental charges imposed on them not exceed 30% of their income." *Id.* After trial and further briefing, I conclude that plaintiffs have failed to prove their contention that the meal program violates the statute.

■ Defendants contend that the statutory cap applies only to "rent" and does not prevent additional charges for other services. The fact that food is outside the normal understanding of the term "rent" is not dispositive. The imposition of substantial mandatory charges for luxuries even less closely associated than food with the common understanding of "rent" (such as charges for flower arrangements, distribution of fancy soaps and fragrances, provi-

---

7. The GAO found that 11% of the 930 projects it surveyed had mandatory meal programs. 51 Fed.Reg. 32,764, 32,765 (Sept. 15, 1986).

sion of musical or theatrical entertainments, etc.) would be so clearly incompatible with the purposes of the statute, they would surely be ruled illegal, notwithstanding the correctness of the argument that the word rent does not generally include them. This result might be reached by ruling either that, in imposing a 30% rent cap, the statute intended to cover all charges imposed as a condition of occupancy, or that such charges were incompatible with the statute's objective of making subsidized housing more accessible to the poor. I therefore do not find the question satisfactorily answered by the simple proposition that the cap applies only to rent, which does not include food.

At least three questions must therefore be answered: (a) whether any mandatory charge no matter for what purpose must be seen as a violation of the statute if it exceeds the 30% cap; (2) if not, whether a mandatory charge for provision of food can be allowed under the statute; and (3) if so, whether *this* mandatory meal program in all its details is compatible with the statute.

The most significant factor for resolution of these questions is that Congress entrusted the administration of the program and interpretation of the statute in the first instance to a department of government. HUD is charged with the responsibility of establishing guidelines and passing on the suitability of each project that seeks funding assistance under the statute. Under the Supreme Court's ruling in *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), an agency so charged is entitled to substantial deference from the courts as to its interpretation of the governing statute and the policies it devises for carrying out the statute's purposes.

HUD has consistently determined that a mandatory meal participation program imposing charges in excess of the 30% cap does not on its face violate the statute—that such programs could be maintained so long as their terms were found by HUD to be in conformity with the purposes of the statute. In its recently promulgated rule, HUD expressly authorizes the continuation of existing mandatory meal programs (although it bars the adoption of new such programs).

HUD concluded, furthermore, that the particular program administered by St. Margaret's House was acceptable. At all times since its inception the St. Margaret's program has had HUD approval.

The first conclusion that the "rent" cap does not necessarily bar any mandatory charge exceeding the 30% cap, is consistent with the view that rent is employed in the statute with its conventional meaning. That view is supported by the Senate Report, which stated

[f]or purposes of determining the maximum amount of assistance payments with respect to any unit, the "rental" for such unit would be the proportionate share of the total *shelter costs* to be borne by the low-income tenants of a project attributable to that unit.

S.Rep. No. 392, 91st Cong., 1st Sess. 19, *reprinted in* 1969 U.S.Code Cong. & Ad. News 1524, 1542 (emphasis added).

It is further supported by the statutory scheme. The statute employs the word and concept of "rent" in two complimentary usages—one being to fix the tenant's rent at a maximum of 30% of her adjusted income, *see* 42 U.S.C. § 1437a(a)(1), the second being to impose on HUD the duty to pay the remainder of the authorized rent, to the extent it exceeds 30% of the tenant's income. *See id.* § 1437f(c)(3). It is unlikely that the word would be used with different meanings in two such closely related complimentary usages. It is also unlikely that, by the second usage, Congress intended to fund payment for food. The most reasonable conclusion is therefore that "rent" in both portions of the statute refers to the charge for shelter, together with closely associated services such as heat, maintenance, refuse disposal, etc., *see* 24 C.F.R. § 880.203(a), and not to other types of service charges a facility might impose.

I conclude that HUD's interpretation of "rent" under the Brooke Amendment is a reasonable one. The Supreme Court re-

cently ruled, furthermore, that HUD's interpretation of this statutory term was entitled to deference. *Wright v. Roanoke Housing & Development Authority,* — U.S. ——, —— & n. 11, 107 S.Ct. 766, 774 & n. 11, 93 L.Ed.2d 781 (1987).

As to the second and third questions— the finding of HUD that mandatory meal programs, and in particular this one, are compatible with the purpose of the statute is also reasonable and entitled to deference. Such a program serves a number of valuable goals in a congregate care facility for elderly and disabled persons. It assures that the residents will have access to a nutritious diet; it promotes friendly social interaction among the residents, combatting the tendency among many elderly people to withdraw in isolation in their apartments; it also assists the management of the facility to be aware of health problems of residents as they develop. (If an elderly resident made a habit of remaining secluded in her apartment, the management might be quite unaware of the onset of an illness and the need for medical assistance.) Furthermore, mandatory participation in the meal program permits the facility to offer meals at a lower price than would otherwise be the case. The value of these contributions to a congregate care facility is great. The fact that a particular resident may be disadvantaged by the program does not make HUD's approval unreasonable. Food, furthermore, is a necessity which residents would have to acquire elsewhere if it were not provided by the program. The program does not subject them to expenses for a type of service that they could properly forego. All courts that have considered the question have found HUD's approval of such programs to be reasonably compatible with the statute, in spite of the additional charge to the tenants above their maximum rent. *Aujero v. CDA Todco, Inc.,* 756 F.2d 1374, 1376 (9th Cir.1985); *Mayoral v. Jeffco American Baptist Residences, Inc.,* 726 F.2d 1361 (10th Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984); *Johnson v. Soundview Apartments Housing Development Fund Co.,* 585 F.Supp. 559, 560, *reconsideration denied,* 588 F.Supp. 1381

(1984), *later opinion,* 647 F.Supp. 1410 (S.D.N.Y.1986); *Chambers v. Toledo Jewish Home for the Aged, Inc.,* No. C 80–575, Memorandum and Order (N.D.Ohio Oct. 23, 1980).

Nor has HUD given carte blanche to any mandatory program, regardless of its reasonableness. It has imposed a number of requirements designed to keep the programs consistent with the purposes of the statute. The details and price of the mandatory meal were subject to HUD's approval. At the start, HUD required of St. Margaret's that it reduce the charge to the extent necessary to leave the resident a minimum of $120 per month. More recently, other requirements were added including exemptions for work, vacation and medically prescribed diet, all of which are designed to ease any financial burden on the residents.

I cannot conclude that HUD has exceeded reasonable bounds in construing the statute to allow for such a program.

Plaintiffs argue that the plan must be seen as violating the objectives of the Brooke Amendment because, reasonable or not, it increases the cost of residence at the facility and therefore forecloses access to at least some needy people. This argument attributes to the statute an intention that is not reflected by its words or provisions. The argument depends on the proposition that the statute seeks to make every Section 8 facility affordable to every potential applicant. It is true there is language in the legislative history that proclaims such an objective, but it is contradicted by the statute itself.

The statute unquestionably eased access to poor persons by subsidizing their rent, but the subsidy is a limited one. No matter how small the resident's income, she is required to pay 30% of it towards her rent. Thus a resident who has only $100 per month for lodging, food and other necessaries must pay $30 for rent, leaving only $70 for all other necessities. By its own terms the statute rebuts plaintiffs' contention.

The argument might be considerably stronger if the statute were designed to provide full subsidy below a minimum income level. It does not do so.

In this respect the meal plan evinces greater concern for the poverty line than the statute. It fully subsidizes the meals to the extent that payment would take the residents' residual income below $120. The rent subsidy does not. Thus, the hypothetical tenant with a total income of $100 per month is better off with the St. Margaret's program than without, as it gives her 30 free meals per month.

I therefore cannot agree with plaintiffs' contention that the statute seeks to eliminate *all* financial obstacles to residence in a funded facility. Although the meals program may well add some financial burden for certain residents, depending how little they would otherwise spend on food, it diminishes the burden on others, providing them with free meals. It is within the discretion of HUD to approve such a program.

The reasonableness of HUD's interpretation is further strengthened by the fact that only a small percentage of Section 8 facilities operate with a mandatory meal plan. This means that applicants who consider its provision advantageous can seek admission at facilities where such a plan operates while those who do not can seek admission elsewhere. This distinguishes cases in which courts have struck down the imposition by local authorities of eligibility criteria not authorized by the public housing statute. *Cf. James v. New York City Housing Authority*, 622 F.Supp. 1356 (S.D. N.Y.1985); *Fletcher v. Housing Authority of Louisville*, 525 F.2d 532 (6th Cir.1975), *reinstating*, 491 F.2d 793 (6th Cir.1974); *Ferguson v. Metropolitan Development and Housing Agency*, 485 F.Supp. 517 (M.D.Tenn.1980).

*The Regulatory Agreement*

Plaintiffs contend that even if the statute does not bar a mandatory meal charge in excess of the 30% rent cap, this is barred by the Regulatory Agreement made between HUD and St. Margaret's House. Plaintiffs claim to be the third-party beneficiaries of this contract.

■ There are at least two serious flaws in the plaintiffs' argument:

First, each plaintiff agreed to the mandatory meal program upon applying to St. Margaret's House. Plaintiffs did not make out a sufficient showing of duress to nullify their agreement.

Second, it surely misconceives the Regulatory Agreement to describe it as a promise exacted by HUD that St. Margaret's would not operate a mandatory meal program. Although it is possible to find words in the text of the Agreement that seem to support this conclusion, we know it is completely contrary to the contractual relationship between St. Margaret's and HUD. HUD did not exact a promise that there would be no mandatory meal program. To the contrary, HUD expressly approved St. Margaret's plan after careful review of its provisions. The argument is completely inappropriate.

I need not reach the issue that I noted in the motion to dismiss, whether *Reiner v. West Village Associates*, 768 F.2d 31, 32 (2d Cir.1985) bars suit employing the third-party beneficiary theory under Regulatory Agreements governing Section 8 projects.

*St. Margaret's Counterclaim*

Since the inception of this lawsuit several plaintiffs have engaged in a strike, refusing to participate in the mandatory meal program. St. Margaret's counterclaims to recover the meal payments that these plaintiffs agreed to pay in their contracts for residency, but did not make. Plaintiffs defend on the grounds of the illegality of the plan under the Brooke Amendment and of the APA deficiencies in HUD's adoption of its policy governing the plan.

I have rejected the plaintiffs' contention under the Brooke Amendment. As to the defenses based on HUD's conduct, although similar claims were sustained against HUD in another lawsuit, it is not clear that the deficiencies in HUD's policy can avail plaintiffs as a defense against St. Margaret's claims for plaintiffs' breach of contract. Plaintiffs entered into voluntary

agreements with St. Margaret's to participate in the meal program. The fact that HUD had not conducted a notice and comment procedure prior to the adoption of its policy was no less true when plaintiffs entered the agreement than it was when plaintiffs decided to stop paying.

St. Margaret's planned its financial and physical structure and built its kitchen and dining facilities in justified reliance on HUD's approval. It has borne substantial losses by reason of plaintiffs' refusal to honor their contracts. HUD's procedural deficiencies furthermore played no role in plaintiffs' refusal to honor their contracts. Months ago HUD concluded a new rule-making process after notice and comment as required by the APA. Plaintiffs brought no amended complaint challenging the new procedure or the adoption of the new rule. They concede that HUD's adoption of the new rule moots their APA claims against HUD. Nonetheless, plaintiffs did not resume participation in accordance with their agreements.

Insofar as HUD's deficiency lay in its earlier failure to require reasonable exemptions, this is not relevant to these plaintiffs' defenses as none of them has shown entitlement to any of the exceptions now available.

I conclude that plaintiffs' claims under the Administrative Procedure Act do not provide a defense against St. Margaret's claim for breach of plaintiffs' contracts. St. Margaret's is entitled to a judgment for damages. St. Margaret's loss, however, is reduced by the savings it realized by not preparing meals for the plaintiffs during the period of their strike.

Judgment is granted to the defendants on each of plaintiffs' claims. St. Margaret's House is entitled to judgment on its counterclaim.

SO ORDERED.