Josefina GONZALEZ, et al.,
Plaintiffs–Appellants and
Cross–Appellees,

v.

ST. MARGARET'S HOUSE HOUSING
DEVELOPMENT FUND CORPORA-
TION, a New York Corporation, Defen-
dant–Appellee and Cross–Appellant.

Nos. 1169, 1309. Dockets
89–7002, 89–7030.

United States Court of Appeals,
Second Circuit.

Argued June 7, 1989.

Decided July 13, 1989.

As Amended Aug. 1, 1989.

---

Bruce Birenboim, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Jay Greenfield, Catherine J. Ross, of counsel), for plaintiffs-appellants and cross-appellees.

Joseph Polizzotto, New York City (Cadwalader, Wickersham & Taft, Peter G. Bergmann, Susan A. Lifsey Portes, Toula Stroumbakis, of counsel), for defendant-appellee and cross-appellant.

Before FEINBERG and KEARSE, Circuit Judges, and BARTELS, District Judge.*

FEINBERG, Circuit Judge:

A number of tenants, past and present, of St. Margaret's House Housing Development Fund Corporation (St. Margaret's), appeal from a judgment of the United States District Court for the Southern District of New York, Pierre N. Leval, J., dismissing their federal antitrust claim and declining to exercise jurisdiction over their state antitrust claim. Appellants allege that St. Margaret's violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y.Gen.Bus.Law § 340, by enforcing an illegal tying arrangement that requires residents of the facility to purchase a meal per day at St. Margaret's. The district court found that because St. Margaret's has no economic interest in the sale of the tied product, appellants failed to state a claim upon which relief can be granted. For reasons given below, we vacate and remand.

### Background

St. Margaret's is a non-profit housing facility for low-income, elderly and handicapped people in New York City. It provides congregate care; i.e., housing "connected with which there is a central dining facility to provide wholesome and economical meals" to the residents. 42 U.S.C. § 1437e. The facility opened in 1981 and currently houses approximately 290 people in 249 housing units. Its construction was financed by a direct loan from the United States Department of Housing and Urban Development ("HUD") pursuant to § 202 of the National Housing Act of 1959, 12 U.S.C. § 1701q, and it receives an operating subsidy for rental payments from HUD under the Section 8 Housing Assistance Program.

St. Margaret's provides its low-income residents a "core service program," which includes a mandatory meal program. In an earlier Housing Act challenge to the meal program, Judge Leval found that "[t]he specified purposes of the meal plan were to ensure proper nutrition, encourage social interaction and a sense of community, and allow management to identify residents' health problems as they arise." *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, 668 F.Supp. 187, 189 (S.D.N.Y.1987), aff'd, 848 F.2d 391 (2d Cir.1988) (per curiam). St. Margaret's is precluded by federal regulation from using income received from the meal program to subsidize other costs and from earning a profit on it. Indeed, according to the judge, St. Margaret's operates the program at a loss since it "merely conveys the meal payments to its outside contractor which charges it more than it receives from the residents." The residents of St. Margaret's are now assessed a monthly charge of $130 to pay for 30 meals. In the earlier Housing Act challenge to the program, the district court found that each resident is provided with soup or juice, an entree, two vegetables, salad, bread and butter, dessert, milk or punch or soda and coffee or tea. *Id.* at 190. St. Margaret's presently provides exemptions from the meal program for various reasons, e.g., vacations, hospitalization and medical problems.

* Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

For the last four or five years, a relatively small group of tenants at St. Margaret's has been objecting to the mandatory nature of the meal program. In 1984, some of the residents (including some of the present plaintiffs) challenged the meal program as violative of the Brooke Amendment to the Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), which caps each eligible tenant's "rent" at 30% of the tenant's adjusted gross income, and on various other grounds. This challenge was rejected by Judge Leval in August 1987 after a three-day bench trial. *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, 668 F.Supp. at 192–95. Judge Leval's findings in the Housing Act case provide pertinent background to this appeal.

The present action was commenced in 1985 by 22 plaintiffs (St. Margaret's claims that only 15 remain in the action and notes that only six are parties to a companion state-court action). Appellants allege that the mandatory meal plan constitutes an unlawful tying arrangement that violates the Sherman Act and the Donnelly Act. Appellants do not wish to purchase meals from St. Margaret's, and claim that they prefer to prepare their meals in the fully equipped kitchen in each apartment or purchase prepared meals from suppliers other than St. Margaret's. In October 1987, St. Margaret's moved to dismiss the complaint for failure to state a claim. In October 1988, the district court dismissed the federal claim, holding that "[b]ecause defendant has no economic interest in the sale of the tied product, an element essential to a claim for illegal tying is lacking." In passing, the district court also noted that "it is highly doubtful that plaintiffs can satisfy the element of an antitrust violation that requires 'involvement of a not insubstantial amount of interstate commerce in the tied market.'" After the decision was handed down, appellants requested clarification of the court's order with respect to the pendent Donnelly Act claim, and in its final judgment, the district court declined to exercise jurisdiction over that claim.

Thereafter, appellants appealed from dismissal of the Sherman Act claim, and St. Margaret's cross-appealed from the district court's refusal to exercise jurisdiction over the Donnelly Act claim.

## Discussion

This case demonstrates the difficulty in applying a per se illegality rule in situations that do not usually present antitrust law issues. Appellants claim that St. Margaret's is using its "competitive leverage" in the low-income housing market to coerce appellants into purchasing meals from St. Margaret's House that "they do not want." Appellants argue that this impermissible use of market power is a classic, illegal tie under the Sherman Act, and that the district court erred in dismissing their complaint for failure to allege an "economic interest" requirement that has never before been required by this circuit. Appellants also argue that even if we adopt the "economic interest" requirement, their complaint still states a claim upon which relief can be granted. Appellee St. Margaret's argues that we should adopt the district court's "economic interest" analysis because it is "an important element to a cognizable illegal tying claim." Appellee addresses the actual dangers of tying arrangements, that the Sherman Act was designed to prevent, and argues that none exist here.

■ A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). A seller violates the antitrust laws through a tying arrangement when it uses its market power over one product to "force" a consumer to purchase a second product. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). In the past, we have required allegations and proof of five specific elements before finding a tie illegal: first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the

tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a "not insubstantial" amount of interstate commerce in the "tied" market. *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir.1980).

## A. The "Economic Interest" Test

■ Many of our sister circuits, however, have added another requirement for proving an illegal tie: an economic interest of the tying seller in the tied market. See, e.g., *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co.*, 758 F.2d 203, 207–08 (7th Cir. 1985); *Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 456 (5th Cir.1979); *Venzie Corp. v. United States Mineral Prods. Co.*, 521 F.2d 1309, 1317–18 (3rd Cir.1975). In addition, a number of district courts in this circuit also have cited this doctrine with apparent approval. See, e.g., *Nassau–Suffolk Ice Cream, Inc. v. Integrated Resources, Inc.*, 114 F.R.D. 684, 690 (S.D.N.Y.1987); *Posa, Inc. v. Miller Brewing Co.*, 642 F.Supp. 1198, 1210 (E.D.N.Y. 1986).

These courts favor the adoption of this additional element because they believe that it most effectively addresses what they regard as the true danger of tying arrangements: that the tying seller will acquire market power in the tied-product market. *Carl Sandburg Village Condominium Ass'n*, 758 F.2d at 208; *cf. Jefferson Parish*, 466 U.S. at 38, 104 S.Ct. at 1572 (O'Connor, J., concurring in judgment); Sullivan, *Handbook on the Law of Antitrust* 431 (1977). According to this theory, if the tying entity receives no economic benefit from the tie, then we can safely presume that it is not attempting to spread its power into the tied-product market, and we need not strike the arrangements down as an illegal tie under the antitrust laws. *Carl Sandburg Village Condominium Ass'n*, 758 F.2d at 208; *Posa*, 642 F.Supp. at 1210.

It does not seem, however, that a majority of the Supreme Court has as yet cut back on the application of tie-in doctrine by incorporating this additional requirement

into the test for an illegal tying arrangement. See *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 718 & n. 5 (7th Cir.1987). Instead of focusing its analysis on the tying entity's interest in or profit from the tied market, the majority in *Jefferson Parish* focused primarily on the anticompetitive effect of tying arrangements and the resultant harm to consumer choice in the tied-product market. *Jefferson Parish*, 466 U.S. at 14–15, 104 S.Ct. at 1559–1560. In protecting those interests, the majority in *Jefferson Parish* appeared to require a plaintiff to prove only that the tie impairs competition in the tied market and forecloses a substantial volume of commerce in that market. *Parts and Elec. Motors*, 826 F.2d at 718 (citing *Jefferson Parish*, 466 U.S. at 14, 16, 104 S.Ct. at 1559, 1560). The majority in *Jefferson Parish* does not require any "economic interest" by the tying seller in the tied-product market.

Moreover, even if we were to adopt the "economic interest" test, it is not clear that the district court was correct in ruling that St. Margaret's has no "economic interest" in the tied product. While the meals are furnished by an outside contractor, St. Margaret's does receive money for the service from appellants, and they claim that this reduces St. Margaret's losses each year even though it does not earn a profit. Moreover, we have found no case finding a lack of "economic interest" in a situation where the same party actually sold the tying and the tied product directly to the consumer. Finally, it seems ill-advised for us to adopt such a significant change, with possibly far-reaching ramifications, in our tie-in doctrine in a case as devoid of ordinary antitrust considerations as this one, especially if the problem does not have to be addressed. Under all the circumstances, we do not feel justified, in this situation, to choose to add a sixth requirement of "economic interest" to our test for proving an illegal tying claim.

## B. Impact on Interstate Commerce

In order to state a tying claim, therefore, appellants need only allege the five specific

elements enunciated previously. See *Yentsch*, 630 F.2d at 56–57. Whether or not appellants have satisfied all of the first four elements of the *Yentsch* test, we agree with the district court that there is a serious question whether appellants can establish the fifth element, which requires them to show that the alleged tie forecloses a "not insubstantial" amount of potential sales for the tied product. See *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir.1988) (citing *International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947)).

██ The Supreme Court has stated that as a threshold matter there must be a substantial potential for impact on competition in the tied market in order to justify per se condemnation of an alleged tying arrangement. *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560. "If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." *Id.* The Supreme Court has defined "substantial" in this context as "substantial enough in terms of dollar-volume so as not to be merely *de minimis*." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 501, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969) (*Fortner I*). For purposes of determining substantiality, a court measures the total volume of sales tied by the "policy" under challenge, not merely the portion of this total accounted for by the particular plaintiff who brings suit. *Id.* at 502, 89 S.Ct. at 1258.

There is no magic number that definitively establishes whether a plaintiff has foreclosed a "not insubstantial" amount of potential sales for the tied product. In *Fortner I*, the Supreme Court held that a sum of almost $200,000 is not "paltry or 'insubstantial.'" *Id.* at 502, 89 S.Ct. at 1258. See also *United States v. Loew's Inc.*, 371 U.S. 38, 49, 83 S.Ct. 97, 104, 9 L.Ed.2d 11 (1962) (payments ranging from $60,800 to over $2,500,000 were substantial). We have said that $600,000 of commerce clearly meets "any test of substan-

tiality," *Yentsch*, 630 F.2d at 58, and in the same case, we stated that we were not convinced that $15,000 would be " 'substantial enough . . . so as not to be merely *de minimis*.' " *Id.* (quoting *Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1257). Other courts have come to varying conclusions. See *Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1419–20 (11th Cir. 1987) ($10,091.07 is not de minimis); *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1503 (11th Cir.1985) ($325 is de minimis), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); *Aamco Automatic Transmissions, Inc. v. Tayloe*, 407 F.Supp. 430, 436 (E.D.Pa.1976) ($50,000 over four years with respect to one plaintiff in class action is not de minimis). In their complaint, appellants suggest that the amount of purchases that are foreclosed by the mandatory meal program is approximately $330,000, the total annual meal charges collected from approximately 250 residents. We agree with the district court that this sum overstates the amount of commerce foreclosed because the record already indicates that many residents would continue to use the meal plan by choice. The district court noted that the annual mandatory meal fees for the 22 original plaintiffs, albeit at the slightly lower monthly rate then in effect, came to approximately $30,000. Moreover, this figure may also overstate the amount of commerce foreclosed by the mandatory meal policy because some plaintiffs would choose not to buy the product (the single, prepared meal) at all, see *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560, for a variety of reasons; e.g., they might cook in their rooms at lower cost. (Each apartment has a full kitchen.) In *Jefferson Parish*, the majority specifically stated that "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition." *Id.* In any event, the district court's prediction that "it is highly unlikely that plaintiffs would prevail" on this issue seems correct. Yet, we cannot decide this issue definitively on the limited record before us.

■ Under the circumstances, we think it best to remand this case to the district court for a very limited inquiry to determine whether the impact of the alleged tying arrangement is substantial enough to warrant the protection of the antitrust laws. Although the relevant benchmark for determining substantiality is not absolutely clear, see *Tic–X–Press*, 815 F.2d at 1419, we believe that the district court, in making this determination, should take into consideration the actual number of people affected by the disputed policy. See *Johnson v. Soundview Apartments Housing Dev. Fund Co.*, 588 F.Supp. 1381, 1383 (S.D.N.Y.1984); cf. *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560. Although one might read *Fortner I*, 394 U.S. at 502, 89 S.Ct. at 1258, to require the district court to consider the total annual meal service charges collected from all the residents, we believe that the Supreme Court in *Fortner I* was primarily concerned with ascertaining the total sales lost to potential competitors due to the tying policy. See *Johnson v. Soundview Apartments Housing Dev. Fund Co.*, 588 F.Supp. at 1383; cf. *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560. If the district court can ascertain such lost sales, it may use that as the relevant figure.[1] The district court should also determine how many appellants actually remain in this case. As indicated above, the number is in dispute. If the district court determines that the total amount of commerce foreclosed is de minimis, the complaint should be dismissed.

In his opinion below, Judge Leval indicated his concern that discovery on the antitrust claim might cause undue hardship to St. Margaret's. The district court has substantial discretion in controlling the scope and nature of discovery. On remand, the court should exercise this authority aggressively to make sure that discovery is strictly limited to the information necessary to determine the alleged tie's impact on interstate commerce. An immense amount of time and effort has already been expended by both sides in this litigation. The services of appellants' attorneys in this stubbornly fought litigation[2] are obviously being furnished on a pro bono basis. The target of the litigation is a non-profit institution offering low-cost residence to those in need of housing in New York City. Plaintiffs seek to apply antitrust doctrine to parties and activities that not only are not the sort that ordinarily implicate the Sherman Act but also are already substantially regulated by HUD. Under the circumstances, those engaged in the litigation have special responsibilities to exercise restraint in any further proceedings.

We believe that the facts of this case reveal the possible weaknesses in the per se tying analysis. The furnishing of such a unique congregate care facility should not be subjected so easily to the antitrust laws, and under a "rule of reason" analysis, we are virtually certain that this arrangement would survive scrutiny. Nevertheless, we must, of course, adhere to the views of a majority of the Supreme Court, which has not abandoned the per se test. Compare *Jefferson Parish*, 466 U.S. at 9, 104 S.Ct. at 1556 ("It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements ... are unreasonable 'per se.'") with *Jefferson Parish*, 466 U.S. at 35, 104 S.Ct. at 1570 (O'Connor, J., concurring in judg-

---

1. Of course, the district court may find that, in the absence of a tying arrangement a greater number of residents at St. Margaret's than those who joined as plaintiffs in this case would choose to buy their prepared meals from other suppliers, and, in that case, the figure would be affected accordingly.

2. There have been three actions and numerous published and unpublished opinions regarding this meal program: the Housing Act case, *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, 668 F.Supp. 187 (S.D.N.Y.1987), aff'd, 848 F.2d 391 (2d Cir.1988) (per curiam); *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, 613 F.Supp. 60 (S.D.N.Y.1985); this antitrust suit, *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, No. 85 Civ. 5147 (PNL), slip op. (S.D.N.Y. Oct. 14, 1988); and now a complaint and summons apparently have been served in the New York County Supreme Court in a state antitrust suit, which appellee informs us is entitled *Beckerman, et al. v. St. Margaret's House Housing Dev. Fund Corp.*

ment) ("The time has therefore come to abandon the *'per se'* label....").

As to St. Margaret's cross-appeal, we believe that if appellants' federal claim is again dismissed, the district court has discretion to decline to exercise jurisdiction over appellants' Donnelly Act claim.

Vacated and remanded for further proceedings consistent with this opinion.