James B. BEARD, Plaintiff–Appellant,

v.

PARKVIEW HOSPITAL; Gilbert S. Bucholz; and B.A. Zeiher, Defendants–Appellees.

No. 89–3176.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 7, 1989.

Decided Aug. 23, 1990.

Harland M. Britz (argued), Britz & Zemmelman, Toledo, Ohio, for James B. Beard, D.O.

David W. Wicklund, Robert G. Clayton, Jr. (argued), Shumaker, Loop & Kendrick, Toledo, Ohio, for Parkview Hosp. and B.A. Zeiher, President.

Jamille G. Jamra (argued), Eastman & Smith, Toledo, Ohio, for Gilbert S. Bucholz, D.O.

Before KENNEDY and RYAN, Circuit Judges, and EDWARDS, Senior Circuit Judge.

RYAN, Circuit Judge.

This appeal from a district court's grant of summary judgment presents two issues:

- Whether a tying arrangement, in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, occurs where the supplier of the alleged tying service receives no direct economic benefit from sales of the tied service; and
- Whether section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, is violated where a hospital grants an exclusive contract for the provision of radiological services but does not compete in the market alleged to be monopolized, and supplies a legitimate explanation in support of its exclusive service contract.

We answer both questions in the negative and affirm the district court's summary judgment dismissing the plaintiff's claim.

## I.

James B. Beard, D.O., is an osteopathic physician specializing in radiology who began working for G.S. Bucholz, Inc. on October 1, 1984. Bucholz is the exclusive provider of radiological services to Parkview Hospital, the only osteopathic hospital in Lucas County, Ohio, and serves patients from northwestern Ohio and lower southeastern Michigan. Eight allopathic hospitals also operate in Lucas County.

On June 25, 1985, Dr. Beard resigned from Bucholz, with the intention of providing radiological services himself to patients at Parkview. However, Parkview's chief operating officer, Dr. B.A. Zeiher, told Dr. Beard that Parkview had an exclusive contract with Bucholz for the provision of radiological services and that Dr. Beard would no longer be permitted to work in Parkview's radiology department. He remained a member of the hospital's staff, however.

Dr. Beard filed a complaint in the United States District Court for the Northern District of Ohio, Western Division, naming Parkview, Dr. Zeiher, and Bucholz, defendants. He claimed the contract between Parkview and Bucholz was a tying arrangement violating section 1 of the Sherman Act, 15 U.S.C. § 1, and that the contract furthered "a monopoly or attempt to monopolize a part of the trade and commerce

among the several states," in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

Parkview and Bucholz answered that their contract is consistent with a common practice among hospitals trying to remain competitive in the health care field. By contracting with a specific radiologist, hospitals ensure responsibility and accountability for their radiology departments and guarantee the availability of services when needed.

By the terms of the agreement between Bucholz and Parkview, Bucholz bills patients directly for all services it provides, and Parkview does not share in the fees Bucholz charges.

The district court granted Parkview and Bucholz's motions for summary judgment, pursuant to Fed.R.Civ.P. 56. It dismissed Dr. Beard's section 1 claim because Parkview, the alleged tying service seller, received no direct economic benefit from the sale of the allegedly tied radiological services. It dismissed Dr. Beard's section 2 claim against Parkview because Parkview was not a competitor in the radiological services market, and dismissed the section 2 claim against Bucholz because Dr. Beard failed to rebut the legitimate reasons advanced by defendants for maintaining the exclusive agreement.

## II.

■ A motion for summary judgment in an antitrust case requires the plaintiff to show that there is "a genuine issue of material fact as to whether [the defendants] entered into an illegal conspiracy that caused [the plaintiff] to suffer a cognizable injury." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (citations omitted). Dr. Beard's obligation to avoid summary judgment was to present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to whether Parkview and Bucholz engaged in an illegal tying arrangement or attempted to monopolize a segment of the radiological services market. The district court then had to deter-

mine whether Parkview, Dr. Zeiher, and Bucholz were "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We must now review the district court's legal determination on that question *de novo*.

### A. The Tying Arrangement

■ A so-called tying arrangement exists when a seller conditions the sale of one product or service, the tying product or service, on the buyer's purchase of another product or service, the tied product or service. *See Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

■ A tying arrangement is *per se* unlawful under section 1 of the Sherman Act; that is, it is proscribed without examining the actual market conditions, when the seller has such power in the tying product or service market that "the existence of forcing is probable," *id.* at 15, 104 S.Ct. at 1560, and there is "a substantial potential for impact on competition." *Id.* at 16, 104 S.Ct. at 1560. A tying arrangement which is not *per se* unlawful may be invalidated under the "rule of reason" if the party challenging the tie demonstrates that it is "an unreasonable restraint on competition in the relevant market." *Id.* at 18, 104 S.Ct. at 1561.

■ As previously noted, the alleged tying arrangement challenged in this case arises from the exclusive contract Parkview entered into with Bucholz for the provision of radiological services. Consequently, under the *Jefferson Parish* analysis, we must decide whether Parkview's contract with Bucholz is illegal as *forcing* surgical patients at Parkview to obtain ra-

diological services from Bucholz which they might wish to obtain from another provider or as unreasonably restraining competition among radiologists in the Parkview area. We first examine, however, the precise reason for the district court's dismissal of Dr. Beard's section 1 claim.

In its decision granting Parkview's motion for summary judgment, the district court said:

> In order for a tying arrangement to violate § 1 of the Sherman Act, the seller must exploit its market power over the tying product to force the buyer into purchasing a tied product that the buyer either did not want at all, or might have preferred to purchase from someone else. An implicit requirement to a finding that a tying arrangement violates § 1 is that the seller of the tying product must also profit from the sale of the tied product.

The district court went on to say that, "[i]n all of the cases addressing this question which the Court is aware of, the courts require that the seller of the tying product must have benefited *directly* from the sale of the tied product." And, "[i]n this case, it is clear from the evidence before the Court that none of the monies paid to Bucholz, Inc. reached Parkview's hands. Therefore, the Court finds defendants' motions for summary judgment as to plaintiff's § 1 claim well taken."

The district court's reliance on the "direct economic benefit" rule was well-grounded in antitrust law.

Prior to *Jefferson Parish*, courts ordinarily tested a challenged tying arrangement for section 1 validity by determining whether the provider of the tying product or service derived any direct economic benefit from the arrangement. An absence of direct economic benefit was taken as a determinative indicator that the provider of the tying product or service had no anticompetitive impact upon the market for the tied product or service. *See, e.g., Venzie Corp. v. United States Mineral Products Co., Inc.,* 521 F.2d 1309, 1317 (3d Cir.1975); *Miller Motors, Inc. v. Ford Motor Co.,* 252 F.2d 441, 446–47 (4th Cir.1958); *Keener v.*

*Sizzler Family Steak Houses,* 597 F.2d 453, 456 (5th Cir.1979); *Crawford Transp. Co. v. Chrysler Corp.,* 338 F.2d 934, 939 (6th Cir.1964), *cert. denied,* 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965); *Roberts v. Elaine Powers Figure Salons, Inc.,* 708 F.2d 1476, 1478–81 (9th Cir.1983). These courts dismissed section 1 Sherman Act claims where the seller, accused of providing an alleged tying product or service, did not derive any direct economic benefit from the sale of the product said to be tied.

Notable among these decisions is *Crawford Transp. Co.* in which this court held that Chrysler Corporation "was guilty of no tying arrangement in violation of Section 1 of the Sherman Act" when it required its dealers to purchase new car delivery services from the company with which Chrysler had an exclusive contract along with new cars the dealers bought. 338 F.2d at 939. This court said:

> Chrysler owned no transportation companies and had no financial interest in any of the transportation carriers to which it tendered traffic for its 1958 and subsequent models. It did not seek to invade and dominate the automobile transportation carriers' business. True, Chrysler benefited financially to the extent that it saved millions of dollars in the cost of transportation but it received no direct profits from the transportation carriers.

*Id.* The district court cited *Crawford Transp. Co.,* for its reliance upon the "direct economic benefit" rule.

On appeal, Dr. Beard concedes that the district court correctly found that Parkview derives no direct economic benefit from the radiological services provided by Bucholz. He also concedes that if *Crawford* is a correct statement of the law, his section 1 claim fails. He contends, however, that in *Jefferson Parish* the Supreme Court overruled *sub silentio* those cases, including *Crawford Transp. Co.,* holding that the supplier of a tying product or service who receives no direct economic benefit from the sale of the tied product or service is not guilty of an illegal tying arrangement under section 1 of the Sherman Act.

After a careful examination of *Jefferson Parish*, and a number of cases applying it, as well as the recent decision of *Gonzalez v. St. Margaret's Housing Div. Fund*, 880 F.2d 1514 (2d Cir.1989), which Dr. Beard cites in support of his argument, we are unpersuaded that the "direct economic benefit" requirement of *Crawford Transp. Co.* has been displaced or is otherwise inapplicable to this case.

In *Jefferson Parish*, the Supreme Court held that a contract between a hospital and a firm of anesthesiologists was not a *per se* violation of section 1 of the Sherman Act merely because the agreement required patients to buy all the anethesiological services they needed from the firm. 466 U.S. 28–29, 104 S.Ct. at 1566–67. The Court also held that the claimant in that case failed to make a showing of adverse competitive effect resulting from the agreement sufficient to demonstrate rule of reason invalidity. *Id.* at 30–31, 104 S.Ct. at 1567–68.

To be sure, the Court in *Jefferson Parish* did not state that the seller of a tying product or service must secure a direct economic benefit from sales of a tied product or service in order to violate section 1 of the Sherman Act. The Court's analysis turned on whether the seller of the alleged tying and tied services, namely Jefferson Parish Hospital District No. 2, used its market power "to force patients to buy [anesthesiological] services they would not otherwise purchase," *id.* at 26, 104 S.Ct. at 1566, and whether the effect of the exclusive contract for anesthesiological services was to unreasonably restrain competition among anesthesiologists in the hospital's market. *Id.* at 29. 104 S.Ct. at 1567. But, the Court's silence in *Jefferson Parish* on the "direct economic benefit" issue ought not be interpreted as overruling the considerable body of pre-*Jefferson Parish* precedent relying on the "direct economic benefit" requirement as a means of determining whether a challenged contract or agreement is an illegal tying arrangement.

The Court in *Jefferson Parish* was not required to address the "direct economic benefit" issue because there was no dispute that the hospital in that case received a direct economic benefit from each sale of anesthesiological services. The Court noted that while "[t]he fees for anesthesiological services are billed separately ... [t]hey are divided equally between [the anesthesiology firm] and the hospital." *Id.* at 6 n. 4, 104 S.Ct. at 1555 n. 4.

Moreover, the "direct economic benefit" requirement is consistent with the Court's explanation of what an illegal tying arrangement is in *Jefferson Parish:*

[T]he law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures. This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product, and can increase the social costs of market power by facilitating price discrimination, thereby increasing monopoly profits over what they would be absent the tie.

*Id.* at 14–15, 104 S.Ct. at 1559 (citations and footnotes omitted). A seller who derives no direct economic benefit from sales of an alleged tied product or service is not attempting to invade the alleged tied product or service market in a manner proscribed by section 1 of the Sherman Act.

Furthermore, our conclusion that the pre–*Jefferson Parish* cases recognizing the "direct economic benefit" requirement in illegal tying cases were not overruled by *Jefferson Parish* is supported by numerous post-*Jefferson Parish* decisions holding that the absence of a direct economic benefit to the seller from sales of an alleged tied product or service precludes a determi-

nation that the alleged illegal tying arrangement violates the Sherman Act under either the *per se* or rule of reason analysis. *See, e.g., White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104 (4th Cir.1987); *Directory Sales Management v. Ohio Bell Tel. Co.,* 833 F.2d 606, 610 (6th Cir.1987); *Sandburg Village Condominium Ass'n v. First Condominium Development Co.,* 758 F.2d 203, 209 and 210 (7th Cir.1985); *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 712 (11th Cir.1984). Notable among those cases is this court's decision in *Directory Sales,* in which we affirmed a district court's entry of summary judgment in a case alleging a illegal tying arrangement, stating, "[i]f Ohio Bell does not receive a financial benefit from the tied product, case law indicates that a tying arrangement does not exist." 833 F.2d at 610 (citations omitted).

In support of his argument to the contrary, Dr. Beard cites the Second Circuit *Gonzalez* case. 880 F.2d 1514.

In *Gonzalez,* the court of appeals remanded the appeal of a number of tenants of a non-profit housing facility who sued the facility under section 1 of the Sherman Act. *Id.* at 1520. The tenants alleged that the facility was engaged in an illegal tying arrangement by its requiring that they purchase at least one meal, supplied by a third party, every day they stayed at the facility. *Id.* at 1515–16. The Second Circuit remanded the case so that the district court could determine whether the alleged tying arrangement impacted interstate commerce and, thus, whether the Sherman Act applied. *Id.* at 1519. But, because the district court had formerly dismissed the *Gonzalez* tenants' claim on the ground that the housing facility had no economic interest in the sale of the meals, *id.* at 1515, the court of appeals addressed the "direct economic benefit" issue. *Id.* at 1517. The court

said, "We do not feel justified, in this situation, to choose to add a sixth requirement of 'economic interest' to our [five-part] test for proving an illegal tying claim." *Id.*[1] The court reasoned:

> The majority in *Jefferson Parish* focused primarily on the anticompetitive effect of tying arrangements and the resultant harm to consumer choice in the tied-product market. In protecting those interests, the majority in *Jefferson Parish* appeared to require a plaintiff to prove only that the tie impairs competition in the tied market and forecloses a substantial volume of commerce in that market. The majority in *Jefferson Parish* does not require any "economic interest" by the tying seller in the tied-product market.

*Id.* (citations omitted). The court then went on to suggest that, even if it were to adopt the "economic interest" test, it believed the housing facility received some economic benefit, albeit no profit, from the meal sales. *Id.*

While it is arguable that *Gonzalez* can be distinguished from this case as declining only in dicta to adopt the "direct economic benefit" requirement, we shall assume instead that *Gonzalez* is directly contrary to our holding in *Crawford Transp. Co.* and the line of cases previously cited that require a provider of the alleged tying product or service to derive a direct economic benefit from sales of the alleged tied product or service in order for an illegal tying arrangement to be found. We believe the rule of *Crawford Transp. Co.* to be the better reasoned rule; one consistent with the fundamental antitrust policy opposing the use of market power in one part of the economy to acquire power in another part and one to which we are bound as the rule of this circuit.[2]

---

**1.** The Second Circuit's five elements for finding an illegal tying arrangement are:

First, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the

involvement of a "not insubstantial" amount of interstate commerce in the "tied" market. *Gonzalez,* 880 F.2d at 1516–17 (citing *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56–57 (2d Cir.1980)).

**2.** We can only note as a curiosity the *Gonzalez* court's unwillingness to "add" a sixth, "economic interest" requirement to its list of five elements for an illegal tying arrangement on the

**144**

For the foregoing reasons, we hold, as a matter of law, that because Parkview received no direct economic benefit from the radiological services provided to its patients by Bucholz, it engaged in no unlawful tying arrangement, under either the *per se* or the rule of reason approaches, by entering into an exclusive contract for radiological services with Bucholz. The district court did not err in dismissing Dr. Beard's section 1 claim on this basis.

## B. Monopoly

Dr. Beard also claims that the Parkview/Bucholz exclusive services contract violated section 2 of the Sherman Act. He claims that by their agreement, Parkview, and its chief operating officer Dr. Zeiher, and Bucholz were monopolizing or attempting to monopolize the osteopathic radiological services market for northwestern Ohio and southeastern Michigan.

> An unlawful monopoly consists of:
> (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). A plaintiff asserting the offense of monopolization must show, "that a defendant either unfairly attained or maintained monopoly power ... [which] consists of 'the power to control prices or exclude competition.'" *Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 954 (6th Cir. 1983) (citations omitted). Attempted monopolization "occurs when a competitor, with a 'dangerous probability of success,' engages in anticompetitive practices the specific design of which are, to build a monopoly or exclude or destroy competition." *Id.* (citations omitted).

### 1. Parkview and Dr. Zeiher

■ In *Smith v. Northern Michigan Hospitals*, a group of independent doctors on staff at Northern Michigan Hospitals, Inc. ("NMH"), which resulted from the merger of two Petoskey, Michigan hospitals, alleged that NMH's exclusive contract with Burns Clinic Medical Center, P.C. for the provision of emergency room care was part of "a conspiracy designed to monopolize acute care medicine in the Petoskey market in violation of section 2 [of the Sherman Act]." *Id.* at 946. This court affirmed the summary dismissal of a section 2 action against NMH because, "[i]t is beyond question that NMH does not compete in any fashion with the appellants." *Id.* at 955. That is, NMH neither enjoyed nor attempted to enjoy monopoly power in the acute care medicine market in Petoskey.

In the same way, Parkview does not compete with Dr. Beard or Bucholz as a provider of osteopathic radiological services in northwestern Ohio and southeastern Michigan. We do not decide whether "osteopathic radiology" is a unique service for antitrust purposes. But, even assuming, *arguendo*, that it is, Parkview and Dr. Zeiher are entitled to judgment as a matter of law because they neither enjoyed nor were attempting to enjoy monopoly power in the Ohio and Michigan radiological services market.

### 2. Bucholz

■ In *Smith v. Northern Michigan Hospitals,* this court refused to dismiss the independent physicians' monopoly claim against Burns Clinic because "[t]here is ... no evidence provided by the present record to contradict the appellants' allegations that competition exists between appellants and the Burns Clinic for referral patients from the NMH emergency room." 703

ground that the Supreme Court in *Jefferson* focused only on "the anticompetitive effect of tying arrangements and the resultant harm to consumer choice in the tied product market." It would appear that the five elements for evaluating an alleged illegal tying arrangement were not intended by the court in *Yentsch,* upon

which the *Gonzalez* court relied, to comprise an exhaustive list. The *Yentsch* court recognized "considerable logic for using [the 'direct economic benefit'] criterion" even though it did not have occasion to adopt the requirement in that case. 630 F.2d at 57 n. 15.

F.2d at 955. After the case was remanded for further proceedings as to Burns Clinic, the district court dismissed the remaining portion of the complaint against Burns Clinic by granting its motion for summary judgment. This court affirmed the dismissal because, among other reasons, "the plaintiffs submitted no evidence from which the court could infer the defendant's general intent to monopolize. Nor did the plaintiffs submit evidence to rebut the defendant's explanations for the small number of post-merger referrals received by the plaintiffs." *Smith v. Burns Clinic Medical Center,* 779 F.2d 1173, 1176 (6th Cir.1985). Thus, the case was dismissed because the doctors did not, as they were required, "rebut the defendant's legitimate explanations for the alleged anticompetitive conduct with 'significant probative evidence tending to support the complaint.'" *Id.* at 1176 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

Likewise, in this case, Dr. Beard has failed to rebut Bucholz's legitimate explanation for its "anticompetitive" exclusive agreement with Parkview. Parkview and Bucholz explained that their contract is necessary to enhance the quality of care its patients receive as well as improve the efficiency of the hospital. Through use of the exclusive contract, Parkview is able to monitor the radiologists to whom it grants staff privileges, negotiating on behalf of its patients the best available radiological care upon the expiration of each contract's term.

Dr. Beard has provided no "significant probative evidence" to rebut Bucholz's legitimate explanation for its agreement with Parkview. Dr. Beard questions only whether the contract was formally executed as of 1984, when he joined Bucholz, or whether it was signed in response to his filing this lawsuit in 1985. Assuming it was the latter, as Dr. Beard claims, the legitimate explanation Parkview and Bucholz provide for the contract remains unrebutted. The district court properly granted summary judgment in favor of Bucholz on the section 2 claim because Dr. Beard "failed to submit probative evidence

which would 'require a judge or jury to resolve the parties' differing versions of the truth at trial.'" *Id.* (citations omitted).

## III.

For the foregoing reasons, the judgment of the district court dismissing the plaintiff's sections 1 and 2 Sherman Act claims is AFFIRMED.