**COUNTY OF TUOLUMNE; Eric Runte, Plaintiffs–Appellants,**

v.

**SONORA COMMUNITY HOSPITAL; Donovan Teel; Hillside Obstetrics and Gynecology; Medical Group, Inc.; Louis Erich; Sonora Medical Group, Inc., Defendants–Appellees.**

No. 98–17424

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 2000.

Filed Jan. 8, 2001.

Barbara J. Hensleigh, Los Angeles, California, for the plaintiffs-appellants.

J. Thomas Rosch, San Francisco, California, for defendants-appellees Sonora Community Hospital, Lawrence Brunel, M.D., Louis Erich, M.D., and Sonora Medical Group, Inc.

Glenn J. Holder, Fresno, California, for defendant-appellee Donovan Teel, M.D.

Before: SCHROEDER, Chief Judge, and NOONAN and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

Plaintiffs, County of Tuolumne (the "County") and Dr. Eric Runte, a family practitioner, appeal the district court's grant of summary judgment in favor of defendants on their claims of antitrust violations under Section 1 of the Sherman Act, 15 U.S.C. § 1, for restraint of trade, conspiracy to boycott, and illegal tying.[1]

---

1. Dr. Runte also asserted state law defamation claims against defendant Dr. Donovan Teel. We dispose of the appeal as to those claims in an unpublished memorandum disposition filed concurrently herewith.

**1152**

The alleged restraint is a change in the cesarean-section ("C-section") credentialing, or privileging, criteria for physicians by Sonora Community Hospital ("SCH"). The change essentially forecloses a class of medical service providers—family physicians—from the C-section service market.

For the reasons discussed below, we affirm the district court's grant of summary judgment for defendants.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sonora, California, has two hospitals, defendant SCH and Tuolumne General Hospital ("TGH"). SCH, a non-profit, private hospital, has the second highest C-section rate in the Adventist West Health Care System, of which it is a part. Dr. Christopher Mills and defendant obstetricians, Drs. Teel, Lawrence Brunel, and Louis Erich ("defendant OBs"), have privileges to perform C-sections at SCH.[2] They are all members of the SCH OB/GYN/PEDS Department (the "OB Department"), but are not employees of SCH. Defendant OBs have cross-coverage arrangements to cover one another's patients.

TGH is operated by the County. It closed its obstetrics facility in 1982 because, according to plaintiffs' expert, it was uneconomical. TGH considered re-opening its inpatient obstetrics facility in the early 1990s, but a feasibility study concluded that it would not be cost-effective, given the anticipated number of deliveries and the other demands on the hospital's resources. TGH, however, operated an Ambulatory Care Clinic (the "Clinic"). The Clinic was staffed by a nurse midwife and primarily provided prenatal services for women entitled to Medi–Cal,[3] which provides medical benefits to certain disabled persons in California. TGH contracted with defendant OBs and Dr. Mills to provide supervision for the Clinic.

In 1994, TGH hired Dr. Runte as Medical Director of the Clinic and terminated its contract with the OBs. Dr. Runte is not an employee of SCH, but is a member of SCH's General Family Practice Department ("FP Department"), of which Dr. Charles Waldman is chair. Dr. Runte does deliver babies and charges only $1,255 for vaginal deliveries, while Drs. Brunel, Teel, and Erich charge $1,500. Dr. Runte had performed around 110 C-sections during his family practice residency program. To gain more experience, Dr. Runte took additional night and weekend calls during his residency, which he completed in 1993.

Dr. Runte applied for privileges to perform C-section deliveries at SCH in February, 1994. SCH was in the process of approving new criteria restricting who could obtain C-section privileges. Under the new privileging criteria, C-sections could only be performed by Board-certified or Board-eligible obstetricians or by those doctors who had completed a 36–month residency program in obstetrics-gynecology. Dr. Runte did not meet these criteria and was denied C-section privileges.

At SCH, privileging criteria, including the C-section privileges at issue in this case, are generally drafted by the relevant department. The criteria must be approved by the Medical Executive Committee (the "MEC") and SCH's Governing Board (the "Board"). The MEC is comprised of the department chairs, several committee chairs, the Chief of Staff (who is also a Board member), and the administrator, Lary A. Davis, who does not vote. Two of the three defendant OBs, Drs. Erich and Brunel, were members of the MEC when it recommended the C-section privileging criteria to the Board; FP Department Chair Dr. Waldman was also on the MEC.

---

**2.** Dr. Merle Patterson, an orthopedic surgeon, has privileges to perform emergency C-sections, but emergency C-sections are not at issue in this case.

**3.** "Medi–Cal" is California's denomination of Medicaid.

The Board is the final decision-maker on hospital privileging criteria. None of defendant OBs was a member of the Board. Many Board members were non-physician community representatives or had backgrounds in health-care administration.

In 1993, Kathleen Mutchler, SCH Medical Staff Coordinator, had recommended that all departments adopt "bundled" privileges lists, which would group privileges into categories depending on the training and skill required. Dr. Brunel, who became OB Department Chair in 1994, drafted the department's privileging list and placed C-sections in the category of procedures involving high risk and/or requiring special training. The OB Department voted to recomment the draft privilege criteria to the MEC. Dr. Brunel presented the draft privileging criteria to the MEC in July 1995. Dr. Runte gave a presentation to the MEC, opposing the proposed privileging criteria. At Dr. Runte's urging, the MEC formed a task force to advise it on the privileging criteria. The task force was comprised of members of the California Academy of Family Practitioners and the American College of Obstetrics and Gynecology. The MEC made it clear that neither it nor the Board would be bound by the task force's recommendation. In the following months, Mutchler also conducted a telephone survey of seven regional hospitals and found that none granted C-section privileges to family practitioners. In addition, Drs. Brunel, Erich, and Karen Wright wrote letters to SCH, stating that Board certification in obstetrics was a proper standard for eligibility.

When the MEC met to vote in early November 1995, the task force report had not yet been completed. The task force did, however, furnish the MEC with a summary of its findings. It advised that privileges should be based on competence, training, and expertise, rather than specialty. The task force recommended that Dr. Runte be eligible for C-section privileges.

At the November meeting, Dr. Runte opposed the OB Department's proposed privileging criteria. Dr. Teel also addressed the MEC and read a letter to it that he had written. In it, he stated that Dr. Runte did not have enough surgical experience to perform C-sections and asserted that "[i]f the committee proceeds with granting these privileges [to Dr. Runte], each of us [in the OB Department] will then have to individually re-evaluate our present relationship with Sonora Community Hospital." The district court found that the "MEC devoted more time to this privileging issue than to any other issue in recent memory." By a 6–1 vote, the MEC recommended that the Board approve the privilege list. In their declarations, the MEC members gave various reasons for their respective votes, including a belief that the standards would provide an optimal level of care for patients.

In late November 1995, the Board met to address the MEC's recommendation. Administrator Davis reminded the Board members of their responsibility to study carefully all issues that the MEC recommendation raised and to make their final decisions in the best interest of patient care at the hospital. The Board members were provided with 160 pages of documents. They tabled the matter until January 1996, to allow members more time to carefully study the material. The Board also had further information gathered. Mutchler expanded her survey to nine additional regional hospitals and expanded her questions. She found that 13 of the 16 hospitals surveyed did not grant C-section privileges to family practitioners.

The Board met to vote in January 1996. Dr. Runte had sent a letter, and both Dr. Runte and FP Department Chair Dr. Waldman addressed the Board to oppose the proposed privileging criteria. Dr. Runte acknowledged that certain C-section complications could arise that would require him to request assistance from an obstetrician. Dr. Teel made a presentation in favor of the proposed criteria. The district court found that "Board spent more time on this privileging issue than on

any other in recent memory." By an 8–2, secret-ballot vote, the Board approved the privileging criteria as submitted by the MEC. The Board has never voted in a manner inconsistent with a recommendation of the MEC with regard to privileges.

The Board members' decisions, as stated in their declarations, were affected by the fact that adequate, superior care already existed and thus there was no need to lower the standard and potentially compromise patient care. They were also concerned that the hospital itself could be subject to liability if it acted in a manner that was not in the best interest of its patients by lowering the standard for C-section privileges.

Plaintiffs filed this action alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, for restraint of trade, conspiracy to boycott, and illegal tying. Plaintiffs also claimed violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, for attempted monopolization and conspiracy to monopolize. Plaintiffs further alleged state-law antitrust violations under the Cartwright Act, Cal. Bus. & Prof.Code § 16700 *et seq.*, unfair competition, tortious interference with prospective economic advantage, and defamation of Dr. Runte by Dr. Teel.

The district court granted summary judgment for defendants on the all of the federal and state antitrust claims, the unfair competition claim, and, in a separate order, the defamation claims. The district court denied defendants' summary judgment motion on the state law tortious interference claim. Pursuant to a stipulation between the parties, plaintiffs voluntarily dismissed the tortious interference claim, and the district court entered judgment dismissing the action on the merits. Plaintiffs filed a timely notice of appeal.[4] The district court then entered a modified order directing entry of judgment pursuant to Federal Rule of Civil Procedure 54(b), even though the tortious interference claim remained.

4. On appeal, plaintiffs do not pursue their claims under § 2 of the Sherman Act and

## II. JURISDICTION

The district court had jurisdiction over the federal antitrust claims under 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 26, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

The district court's judgment dismissing the action on the merits is a final judgment over which we have jurisdiction under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998). Under Federal Rule of Civil Procedure 56(c), we must view the evidence in the light most favorable to the non-moving party to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In the context of antitrust cases, the Supreme Court has clarified that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citation omitted). Although antitrust cases are sometimes difficult to resolve on summary judgment because of their factual complexity, summary judgment is still appropriate in certain cases. *See Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

## IV. DISCUSSION

We have held that the "antitrust laws apply to hospitals in the same manner

under state unfair competition law.

that they apply to all other sectors of the economy. Health care providers are exposed to the same liability and entitled to the same defenses as businesses in other industries." *Boulware v. Nevada, Dep't of Human Resources*, 960 F.2d 793, 797 (9th Cir.1992). The Supreme Court has acknowledged, however, a "hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *see Laje v. R.E. Thomason Gen. Hosp.*, 564 F.2d 1159, 1162 (5th Cir.1977) (observing that "the decision of a hospital's governing body concerning the granting of hospital privileges is to be accorded great deference").

■ To establish a claim under Section 1 of the Sherman Act, Plaintiffs must show "1) that there was a contract, combination, or conspiracy; 2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint affected interstate commerce." *Bhan*, 929 F.2d at 1410 (citation omitted).

### A. Conspiracy

The district court properly granted summary judgment for defendants on the conspiracy claims because plaintiffs did not adduce *prima facie* proof of the existence of a conspiracy. Plaintiffs cannot survive summary judgment because they have presented neither direct nor circumstantial evidence that reasonably tends to prove that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (internal quotation marks and citation omitted).

### 1. Direct Evidence

■ A claim will survive a motion for summary judgment if there is direct evidence of a conspiracy. *See Arizona v. Standard Oil Co. (In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.)*, 906 F.2d 432, 441 (9th Cir. 1990). We have noted that "[d]irect evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *7–Up Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1093–94 (9th Cir.1999) (quoting *Jacob Blinder & Sons, Inc. v. Gerber Prods. Co. (In re Baby Food Antitrust Litig.)*, 166 F.3d 112, 118 (3d Cir.1999)), *cert. denied sub nom., Gangi Bros. Packing Co. v. Cargill, Inc.*, 529 U.S. 1037, 120 S.Ct. 1531, 146 L.Ed.2d 346 (2000).

■ In *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1451 (9th Cir.1988), for instance, we found direct evidence of a conspiracy, between a hospital and a group of anesthesiologists. The plaintiff, a nurse anesthesiologist, and the anesthesiologists had feuded for a substantial period, and the anesthesiologists had threatened to leave if the plaintiff remained. We further noted that minutes from the hospital Board of Trustees meeting indicated that "the board knew about the threat and feared the quality of the hospital might deteriorate as a result." *Id.*

Plaintiffs rely on the letter written by Dr. Teel, which he read aloud at the November 1995 MEC meeting and submitted to the Board. It states:

> The Obstetricians and the Department of Obstetrics and Pediatrics wants this committee to be aware that we are opposed to this expansion of privileges. We want to be sure that the record reflects our opposition and that we, as individuals and/or as a department, do not wish to bear the responsibility of such a decision.

> If the committee proceeds with granting these privileges, each of us will then have to individually re-evaluate our present relationship with Sonora Community Hospital.

The letter was written on Dr. Teel's own letterhead and was signed only by him. That letter does not constitute direct evidence of a conspiracy because it does not evidence a "meeting of minds" between Defendant OBs and the MEC or the Board. *Monsanto*, 465 U.S. at 765, 104 S.Ct. 1464. In contrast to the hospital board minutes in *Oltz*, nothing in the record indicates that Dr. Teel's letter in any way affected the MEC or Board members' decisions to deny privileges to Dr. Runte. Further, the letter was written on Dr. Teel's own letterhead and he was the only one to sign it. There is no evidence that the other defendant OBs even knew about the "threat."

The Supreme Court held in *Monsanto* that threats that were followed through can constitute direct evidence that "is relevant and persuasive as to a meeting of minds." *Id.* at 765, 104 S.Ct. 1464; *see Oltz*, 861 F.2d at 1451. Unlike in *Monsanto*, even assuming that the other defendant OBs knew about the "threat," there is no evidence in the record that they would follow through with it. The letter alone simply does not constitute direct evidence of a conspiracy "that is explicit and requires no inferences." *In re Citric Acid Litig.*, 191 F.3d at 1094.

### 2. Circumstantial Evidence

Even though we find no direct evidence of a conspiracy, we must determine whether the evidence establishes a conspiracy through circumstantial evidence. We conclude that it does not.

■■■ Relying on the Supreme's Court analysis in *Matsushita*, 475 U.S. at 586–88, 106 S.Ct. 1348, this circuit has outlined a two-part test to be applied when a plaintiff relies solely on circumstantial evidence of a conspiracy to sustain a Section 1 violation. *See In re Citric Acid Litig.*, 191 F.3d at 1094. A defendant can "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct

that is consistent with proper business practice." *Id.* (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987)). "The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Id.*

■■■ Defendants have shown a "plausible and justifiable reason" for establishing the privileging criteria. *Id.* The setting of privileging criteria by a hospital is consistent with providing quality patient care and keeping insurance costs manageable. The burden, therefore, shifts back to plaintiffs to "provide specific evidence tending to show that the [defendants were] not engaging in permissible competitive behavior ... [and] tending to exclude the possibility that defendants acted independently." *Id.* at 1094, 1096. Even viewed in the light most favorable to plaintiffs, none of the evidence excludes the possibility that the Board acted independently. The MEC and the Board spent more time on the privileging issue than on any other in the past. They had multiple meetings, heard extensive testimony, and reviewed numerous documents.

As the Eleventh Circuit has noted, simply because the "board is likely to follow the recommendations of the medical staff does not establish, or even reasonably suggest, the existence of a conspiracy. The plaintiff's argument eviscerates the agreement requirement of section 1." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1459 n. 34 (11th Cir.1991). We find this analysis persuasive. Even though the Board has never disagreed with an MEC recommendation on privileges, the Board did not merely "rubber stamp" the MEC's recommendation. The Board also did not become the "cat's paw" to defendant OBs or Davis.[5] Rather, the Board properly reviewed a plethora of information and made a valid, independent decision regard-

---

**5.** Given that plaintiffs' "cat's paw" theory cannot even serve as circumstantial evidence of a conspiracy, we find no merit to plaintiffs'

argument that it is direct evidence of a conspiracy.

ing privileging criteria at SCH; the Board "was unilaterally executing its authorized power." *Id.* at 1459. The circumstantial evidence does not show a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464. Given that there is neither direct nor circumstantial evidence of a conspiracy, the district court did not err in granting summary judgment to defendants on the antitrust conspiracy claims.

### B. Tying

Plaintiffs also assert a claim against SCH for illegal tying. We conclude that the district court did not err in granting SCH summary judgment on the tying claim because plaintiffs failed to raise any genuine issue of material fact under either a *per se* or rule of reason analysis.

■ A tying arrangement exists when a seller conditions the sale of one product or service (the tying product or service) on the buyer's purchase of another product or service (the tied product or service). *See Northern Pac. Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The Supreme Court has held:

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

*Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. 1551.

The district court properly summarized plaintiffs' tying claim as follows: "SCH has market power in the tying product, hospital obstetrical services. The tied product is c-section services, performed by the obstetricians. If a patient wants to purchase hospital obstetrical services and a c-section is required, the hospital forces the patient to purchase the c-section from Defendant

Obstetricians." [6] *See Jefferson Parish,* 466 U.S. at 23, 104 S.Ct. 1551 (finding two distinct products existed for a tying relationship because "consumers differentiate between anesthesiological services and the other hospital services").

■ Tying can be either a *per se* violation or a violation under the rule of reason. A *per se* tying violation "is proscribed without examining the actual market conditions, when the seller has such power in the tying product or service market that 'the existence of forcing is probable,' ... and there is 'a substantial potential for impact on competition.'" *Beard v. Parkview Hosp.,* 912 F.2d 138, 140 (6th Cir.1990) (quoting *Jefferson Parish,* 466 U.S. at 15–16, 104 S.Ct. 1551); *see Datagate, Inc. v. Hewlett–Packard Co.,* 941 F.2d 864, 870 (9th Cir.1991). A tying arrangement which is not unlawful *per se* "may be invalidated under the 'rule of reason' if the party challenging the tie demonstrates that it is 'an unreasonable restraint on competition in the relevant market.'" *Beard,* 912 F.2d at 140 (quoting *Jefferson Parish,* 466 U.S. at 18, 104 S.Ct. 1551); *see Datagate, Inc.,* 941 F.2d at 870. "Both *per se* rules and the Rule of Reason are employed 'to form a judgment about the competitive significance of the restraint.'" *National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 103, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (quoting *National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)).

#### 1. Per Se *Illegal Tying*

■ To establish that a tying arrangement is illegal *per se,* plaintiffs must prove three elements: (1) a tie between two separate products or services sold in relevant markets; (2) sufficient economic power in the tying product market to affect the tied market; and (3) an effect on a not-insubstantial volume of commerce in the tied

---

**6.** Defendants do not specifically contest this characterization, and thus have waived any argument challenging it. *See Smith v. Marsh,* 194 F.3d 1045, 1052 (9th Cir.1999) (holding that when an argument is not specifically raised in the briefs, it is deemed waived).

product market. *See Bhan,* 929 F.2d at 1411; *Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Sys., Inc.,* 732 F.2d 1403, 1407 (9th Cir.1984).

■ The district court also analyzed a fourth element: whether the defendant has an economic interest in the tied product. *See id.* The economic interest requirement is based on the theory that "if the tying entity receives no economic benefit from the tie, then we can safely presume that it is not attempting to spread its power into the tied-product market, and we need not strike the arrangements down as an illegal tie under the antitrust laws." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 880 F.2d 1514, 1517 (2d Cir.1989).[7] Under this element, we analyze SCH's economic interest in the tied product, C-sections performed by defendant OBs.

■ We conclude that there is no genuine issue of material fact about whether SCH received a "direct economic benefit" from C-sections performed by defendant OBs. *Beard,* 912 F.2d at 141. Defendant OBs are not employees of SCH and there is no evidence in the record that they share their fees with the hospital. Although defendant OBs may charge more for deliveries than Dr. Runte charges, plaintiffs have pointed to no evidence in the record that SCH's profits are in any way affected by who performs deliveries at SCH. Even if SCH has a high C-section rate, there is nothing in the record to show that the hospital receives any "direct economic benefit" from the performance of those C-sections. *Id.*

Plaintiffs argue that SCH received some indirect economic benefits by capturing the pediatric business referred by defendant OBs and by preventing TGH from entering the market. TGH, however, withdrew from and decided against re-entering the market even before SCH established its C-section privileging criteria. Plaintiffs' expert testified that the number of births in the County can only support inpatient obstetrical service at one hospital. TGH conducted an independent study and concluded that it was not economically feasible for TGH to re-open its obstetrical unit. Because they are so attenuated, any indirect economic benefits simply do not raise a genuine issue of *material* fact under the "direct economic interest" requirement. *Id.* In sum, no genuine issue of material fact exists on the *per se* tying claim.

### 2. *Rule of Reason Analysis*

Even though the tying arrangement survives *per se* scrutiny, it still must be assessed for invalidity under the rule of reason. *See Jefferson Parish,* 466 U.S. at 26, 104 S.Ct. 1551 (assessing whether tying arrangement "unreasonably restrained competition" only after rejecting per se illegality); *Robert's Waikiki,* 732 F.2d at 1407–08 (same); *see also* 9 Phillip E. Areeda, *Antitrust Law,* ¶1726f, at 347 (1991) (hereinafter "Areeda").[8]

■ The Supreme Court has explained that "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Soc'y of Prof'l Eng'rs,* 435 U.S. at 691, 98 S.Ct. 1355.

■ Defendants argue that plaintiffs' tying claim must fail under the rule of reason because plaintiffs have proven no more than injury to one competitor, not to competition itself. This court has held that "the *elimination* of a single competitor, standing alone, does not prove anticompetitive effect." *Austin v. McNa-*

---

7. The Second Circuit interprets *Jefferson Parish* as not recognizing economic interest as a requirement of a *per se* illegal tying arrangement. *See Gonzalez,* 880 F.2d at 1517. Our post-*Jefferson Parish* cases, however, continue to recognize the economic interest requirement. *See Robert's Waikiki,* 732 F.2d at 1407.

8. We note that the Sixth Circuit has held, in a case involving hospital services, that failure to establish a direct economic benefit can be fatal to a tying claim under either a *per se* or rule of reason analysis. *See Beard,* 912 F.2d at 144.

*mara,* 979 F.2d 728, 739 (9th Cir.1992) (emphasis in original) (quoting *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 291 (9th Cir.1979)). SCH's privileging decision, however, effectively forecloses an entire class of medical suppliers, family practitioners, from performing C-sections. Thus, we conclude that the rule of reason analysis is not precluded simply because the practical effect of the change in SCH's privileging criteria was that only Dr. Runte was foreclosed from performing C-sections. Antitrust laws apply with equal force in small communities.

■ Under the rule of reason burden-shifting scheme, plaintiffs first must "delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." *Bhan,* 929 F.2d at 1413 (citing 7 Areeda ¶ 1502, at 371–72). Viewing the evidence in the light most favorable to plaintiffs, the district court properly concluded that the relevant geographic market consisted of the County and the five bordering zip codes of Calaveras County.[9] SCH's market share for hospital obstetrical services within this market is 100 percent.[10] Given defendants' complete control over the market, plaintiffs have presented a genuine issue of material fact that defendants' restraint is significant in magnitude. *See American Ad Management, Inc. v. GTE Corp.,* 92 F.3d 781, 790 (9th Cir.1996).

■ The burden then shifts to defendants to offer "evidence that a legitimate objective is served by the challenged behavior." 7 Areeda ¶ 1502, at 372. Here, the Board's concerns for optimizing patients' health, by requiring certain, minimum training for doctors who perform C-sections, certainly are legitimate.

■ The burden then shifts back to plaintiffs to demonstrate that there were less restrictive alternatives to the privileging criteria. *See Bhan,* 929 F.2d at 1413. Plaintiffs produced evidence which suggested requiring additional information from family practitioners before granting C-section privileges. This practice is used at Hanford Community Hospital, one of SCH's parent corporation's other facilities, where family practitioners applying for C-section privileges are required to produce letters of recommendation and surgical reports from C-sections performed during their residency program. Plaintiffs also suggested requiring proctoring of C-sections, monitoring quality through peer reviews, and requiring consultations for difficult cases.

As part of their burden to show the existence of less restrictive alternatives, however, plaintiffs must also show that "an alternative is substantially less restrictive *and* is virtually as effective in serving the legitimate objective *without significantly increased cost.*" 10 Areeda ¶ 1760d, at 369 (emphasis added).

It is difficult to see how a hospital, acting independently and relying solely on letters of recommendation and surgical reports, can assure itself that a physician has the surgical competence represented by Board certification or the supervised experience of a 36–month residency program. Such a substitute, of a hospital independently evaluating a physician's skill in the operating room, can be made effective only by the hospital's incurring substantial costs. The issue, after all, is professional standards in potentially life-threatening situations. Plaintiffs have adduced virtually no evidence to show that their proposed alternatives are as effective as and, at the same time, not significantly more costly than SCH's credentialing policy. Thus, plaintiffs have failed to raise an issue of fact as to whether their proposed less re-

9. Even though there is evidence that women with "high risk" pregnancies travel to Modesto, we must view the evidence in the light most favorable to plaintiffs on summary judgment. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

10. The nearest hospital with obstetrical services is 40 miles away, in Oakdale, and there is no main highway linking these communities.

strictive alternatives can be implemented effectively without significantly increased cost.

Because plaintiffs have failed to meet their burden of advancing viable less restrictive alternatives, we reach the balancing stage. *See* 7 Areeda ¶ 1507b, at 397. We must balance the harms and benefits of the privileging criteria to determine whether they are reasonable. In this case, any anticompetitive harm is offset by the procompetitive effects of SCH's effort to maintain the quality of patient care that it provides. *See, e.g., Weiss v. York Hosp.;* 745 F.2d 786, 821 n. 60 (3d Cir.1984) (dictum) ("Applying the rule of reason analysis, it seems obvious that by restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of the medical care it delivers. Thus such action is procompetitive and, therefore, permissible under the rule of reason."). We conclude therefore that plaintiffs have failed to raise an issue of fact to contest that SCH's privileging criteria for C-section privileges are reasonable. *See BCB Anesthesia Care, Ltd. v. Passavant Mem'l Hosp.,* 36 F.3d 664, 667–68 (7th Cir.1994) (collecting cases).

### C. State Antitrust Claims

The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof.Code § 16700 *et seq.,* was modeled after the Sherman Act. *See Nova Designs, Inc. v. Scuba Retailers Ass'n,* 202 F.3d 1088, 1091 (9th Cir.2000); *Mailand v. Burckle,* 20 Cal.3d 367, 375, 143 Cal.Rptr. 1, 5, 572 P.2d 1142, 1147 (1978). Given our analyses and conclusions regarding the federal claims, the district court properly granted summary judgment on the state antitrust claims, as well.

### V. CONCLUSION

The district court's grant of summary judgment on plaintiffs' federal and state antitrust claims alleging restraint of trade, conspiracy, and tying is

**AFFIRMED.**

